**In re QUALITY HEALTH CARE, Debtor.**

**Gordon E. GOUVEIA, Trustee, Plaintiff,**

**v.**

**INTERNAL REVENUE SERVICE of the United States of America, Defendant.**

Bankruptcy No. 96–61064.
Adversary No. 96–6159.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division at Gary.

July 28, 1997.

---

Gordon E. Gouveia, Merrillville, IN, pro se.

Robin Morlock, Asst. U.S. Atty., Dyer, IN, for Defendant.

## MEMORANDUM OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT BY UNITED STATES OF AMERICA

KENT LINDQUIST, Chief Judge.

## I

### STATEMENT OF PROCEEDINGS

This Adversary Proceeding came before the Court on a Motion for Summary Judgment filed by the Defendant, United States of America (hereinafter: "U.S.A.") on behalf of its Agency, the Internal Revenue Service, (hereinafter: "IRS") on February 27, 1997.[1]

By Order of this Court dated March 10, 1997, Gordon Gouveia, as Plaintiff and the

---

1. The original caption to this Adversary Proceeding as set out in the Trustee's Complaint has been retained for the purposes of this Memorandum Opinion and Order.

Chapter 7 Trustee (hereinafter: "Trustee") of the Chapter 7 Debtor, Quality Health Care, (hereinafter: "Debtor") was given 30 days to file a Response or Answer to said Motion, and upon so doing the U.S.A. was granted 15 days to file a Reply thereto.

A Response or Answer to said Motion for Summary Judgment was filed by the Trustee on March 27, 1997.

A Reply to said Answer was filed by the U.S.A., the movant, on April 11, 1997.

The Trustee's Complaint filed on September 25, 1996 alleges:

1. Debtor Quality Health Care, Inc., filed its Petition for Relief under Chapter 7 of the United States Bankruptcy Code on May 7, 1996.

2. The Plaintiff, Gordon E. Gouveia, was appointed trustee in the above-entitled action and duly qualified as such on May 7, 1996.

3. That at the time of the filing of the aforesaid bankruptcy proceeding, the Debtor possessed monies in a checking account held with the Calumet National Bank under Account No. 098–161–1.

4. That the Defendant caused a Notice of Levy to be sent to the Calumet National Bank on May 1, 1996, a copy of which is attached hereto and made a part hereof as Exhibit "A".

5. That the Defendant seized the Debtor's funds in the aforesaid checking account on May 23, 1996, in the amount of $1,928.01.

6. The funds seized by the Defendant were property of the estate pursuant to 11 U.S.C. Section 541(a)(1), and the action taken by the Defendant occurred postpetition, when the automatic stay was in effect.

7. On August 13, 1996, Plaintiff made a written demand on the Defendant requiring turnover of the aforesaid property. That a copy of Plaintiff's correspondence dated August 13, 1996, is attached hereto and made a part hereof as Exhibit "B".

8. The Defendant has failed and refused to deliver the aforesaid property of the estate to the Plaintiff and wrongfully retains possession thereof without right.

The Trustee prayed that the Court enter an Order requiring the U.S.A. to turn over the estate property seized "postpetition", for attorneys fees, costs and other just relief.

The U.S.A. filed an Answer on November 1, 1997, which alleges, in part, as follows:

3. The United States admits that at the time of the filing of the bankruptcy petition, funds were being held in a checking account at Calumet National Bank under the name of the Debtor. The United States lacks sufficient knowledge or information to form an opinion regarding the truth of the remaining allegations contained in paragraph 3.

4. The United States admits that the Internal Revenue Service served a Notice of Levy upon Calumet National Bank, however, the United States further avers that the Notice of Levy was served upon Calumet National Bank on April 30, 1996. The United States denies the remaining allegations of paragraph 4.

5. The United States denied the allegations contained in paragraph 5 and further avers that, on May 23, 1996, the balance of the checking account of Quality Health Care, Inc. in the amount of $1,903.01, held at Calumet National Bank was turned over to the United States by the Bank.

6. To the extent the allegations contained in this paragraph require a legal analysis and seek a legal conclusion, no response is necessary. The United States denies the remaining allegations contained in paragraph 6.

7. The United States admits that Plaintiff made a written demand upon the Internal Revenue Service for turnover of the funds received by the Internal Revenue Service on May 23, 1996, from the Calumet National Bank account on or about August 13, 1996. The United States further admits that a copy of a portion of Plaintiff's written demand is attached to the adversary complaint at Exhibit B.

8. The United States admits that the Internal Revenue Service has refused to deliver the funds sent by Calumet National Bank to the Trustee. The United States

denies the remaining allegations of paragraph 8.

The Answer also sets out the following Affirmative Defenses:

1. The Court lacks Jurisdiction over the United States because the United States was not properly served with the adversary complaint.[2]

2. The Internal Revenue Service is not an appropriate party to this action. The only appropriate party is the United States of America.[3]

3. The adversary complaint fails to state a claim upon which relief can be granted.

4. The Plaintiff is not entitled to turnover of the funds because he has not identified the use for which the funds will be put.

5. The Plaintiff has not established that he can provide adequate protection for the funds for which he seeks turnover.[4]

## II

### Conclusions of Law and Discussion

#### A

#### Jurisdiction

No objections were made by the parties to the subject-matter jurisdiction of this Court, and the Court concludes that it has subject matter jurisdiction over this Proceeding pursuant to 28 U.S.C. § 1334(b), and that this Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E). In addition, notwithstanding the fact that, in its Answer as an affirmative defense, the U.S.A. alleges that this court is without in personam jurisdiction based on the alleged improper service of the Complaint by the Trustee upon it, the Court concludes that it has in personam jurisdiction over the U.S.A. as service of

the Complaint and Summons upon the U.S.A. appears to fully comport with the requirements of Fed.R.Bk.P. 7004(b)(4) and (5), and was not raised by the U.S.A. in its Motion for Summary Judgment. However, as observed in footnote 2, the U.S.A. is correct as to its Second Affirmative Defense as the Internal Revenue Service is not a proper party defendant. Nevertheless, the U.S.A. did not address this issue in its Motion for Summary Judgment, and proceeded to argue the case on the merits. As a condition of any final order entered in this Adversary Proceeding, the Trustee will be required to amend his Complaint to name the U.S.A. as the proper party defendant.

#### B

### General Principles Relating to Summary Judgment

Under Rule 56(c) Fed.R.Civ.P., as made applicable by Fed.R.Bk.P. 7056, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). The inquiry that the court must make is whether the evidence presents a sufficient disagreement to require trial or whether one party must prevail as a matter of law. *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2511–12.

2. The Trustee served the Complaint and Summons on both the IRS, Cincinnati, Ohio 45999, and the District Director, Attn: Chief of Special Procedures Branch, Indianapolis, Ind. 46244, the Office of the Attorney General, c/o Dept. of Justice, Tax Director, Civil Trial Section, Washington, D.C., and at the Local Office of the United States Attorney. Thus, it would appear that the Trustee properly served the United States in this Adversary Proceeding pursuant to Fed. R. Bk. P. 7004(b)(4) and (5).

3. It is clear that the IRS is not authorized to sue or be sued in its own right. *Matter of Washington,* 172 B.R. 415, 420, n. 4 and n. 5 (Bankr. S.D.Ga.1994).

4. The Motion for Summary Judgment by the U.S.A. did not address Affirmative Defenses, Numbers one, two, and three.

The moving party bears the burden of showing that there is an absence of evidence to support the nonmovant's case. *Celotex Corp. v. Catrett*, 477 U.S. at 325–27, 106 S.Ct. at 2554, *supra*. Stated differently, the moving party, in making a motion for summary judgment, "has the burden of establishing the lack of a genuine issue of material fact." *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir.1984); *Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984).

Federal Rule of Civil Procedure 56(e) provides in part as follows:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

When a motion for summary judgment is made and supported by the movant, Fed. R.Civ.P. 56(e) requires the non-moving party to set forth specific facts demonstrate that genuine issues of fact remain for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 584–86, 106 S.Ct. at 1355, *supra*. Accordingly, once a moving party has met its initial burden, the opposing party must "set forth specific facts showing that there in a genuine issue for trial" and that the disputed fact is material. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir. 1983), *cert. den.*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). Thus, if the movant carries his initial burden, the opposing party may not defeat the motion by merely relying on the allegations or denials in its pleadings. Rather, its response must set forth in the required filings specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. *See also, First National Bank v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1593,

20 L.Ed.2d 569 (1968); *Scherer v. Rockwell International Corp.*, 975 F.2d 356, 360 (7th Cir.1992); *United States v. Pent–R Books, Inc.*, 538 F.2d 519, 529 (2nd Cir.1976), *cert. den.* 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977).

If the nonmovant does not come forward with evidence that would reasonably permit the finder of fact to find in the nonmovant's favor on a material question, then the Court must enter Summary Judgment against the nonmovant. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). The burden on the nonmovant is not onerous. *Id.*, 24 F.3d at 920. The nonmovant need not tender evidence in a form that could be admissible at trial. *Id.*, 24 F.3d at 921. Of course, the evidence set forth must be of a kind admissible at trial. *Id.*, 24 F.3d at 921, n. 2. Moreover, the nonmovant need not match the movant witness for witness, nor persuade the Court that the nonmovant's case is convincing, the nonmovant need only come forward with appropriate evidence demonstrating there is a pending dispute of material fact. *Id.*, 24 F.3d at 921 (Collecting cases).

## C

### *Burden of Proof and Standard of Proof to be Applied on Motion for Summary Judgment*

 The ultimate *burden* of proof at the trial of this Adversary Proceeding is on the Trustee who is the Nonmovant. *Hunter v. Patton (In re Patton)*, 200 B.R. 172, 174 (Bankr.N.D.Ohio 1996) (Trustee bears the burden of proof on a complaint for turnover). *In re Amco Products, Inc.*, 50 B.R. 723, 725 (W.D.Mo.1983); *Yaquinto v. Greer*, 81 B.R. 870, 878 (N.D.Texas 1988); *In re Galster*, 38 B.R. 72, 75 (Bankr.W.D.Mo.1984).

As to the *standard* of proof, it should be noted that the Supreme Court in the case of *Anderson, et al. v. Liberty Lobby, Inc. and Willis A. Carto*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) held that in determining whether a factual dispute exists on a motion for summary judgment, the court must be guided by the substantive evidentiary standards of the case that are applicable

at trial, and thus in ruling on a motion for summary judgment the Supreme Court held that the court must apply the clear and convincing standard in a case where the actual malice rule applied, as this was thus the standard of proof for such a claim.

] Here the standard of proof at trial as to the Trustee as the Nonmovant is by the preponderance-of-the-evidence. *Hunter v. Patton (In re Patton )*, 200 B.R. at 174–75, *supra.* In *Hunter,* the court distinguished *Oriel v. Russell,* 278 U.S. 358, 362, 49 S.Ct. 173, 174, 73 L.Ed. 419 (1929), which held that the clear and convincing evidence standard applied under the bankruptcy act of 1898 in a case for the turnover of assets, by reasoning: (1) that a turnover proceeding is not an action for fraud; (2) referring to the holding in *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991), that the preponderance of evidence standard generally applies in civil actions between private litigants; and, (3) noting that a turnover proceeding under § 542(a) does not apply coercive methods or imprisonment. *Hunter,* 200 B.R. at 174–75. Thus, the court must apply the preponderance-of-the-evidence standard of proof to the Trustee in this Adversary Proceeding in testing the sufficiency of the Motion for Summary judgment by the U.S.A.[5]

### D

### *Materials to be Considered on a Motion for Summary Judgment*

Federal Rule of Civil Procedure 56(c) provides as follows:

> (c) Motion and Proceedings Thereon. The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.* A summary Judgment, interlocutory in character may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages. (Emphasis added).

The court has reviewed the following materials that have been filed of record to determine if they may be properly considered in ruling on the Motion for Summary Judgment by the U.S.A.

1. The Trustee's Complaint and attached Exhibit "A" (Notice of Levy by Lake County Sheriff on behalf of the *Indiana Dept. of Treasury,* to Calumet National Bank, dated May 1, 1996, and received by Bank on May 3, 1996),[6] and Exhibit "B" (Letter by Trustee to IRS dated August 13, 1996 demanding turnover of monies in question) filed by the Trustee on September 25, 1996.

2. The U.S.A.'s Answer and Affirmative Defenses to the Trustee's Complaint filed on November 1, 1996.

3. The U.S.A.'s Motion for Summary Judgment, which included a Statement of Material Facts with Supporting Materials and Brief filed on February 26, 1997.

Attached to the U.S.A.'s Statement of Material Fact as Exhibit "1", is a Notice of Levy by the IRS dated April 30, 1996, relating to the Debtor's bank account showing tax liens in the sum of $978,448.13 as of June 15, 1996. Exhibit "2" is a check dated May 23, 1996 by the Bank to the IRS in the sum of $1,903.01. Exhibit "3" is a Secured Proof of Claim filed by the IRS versus the Debtor's Estate on June

---

**5.** It is noted that § 542(a) expressly provides that any entity shall deliver property to the trustee that he may "sell, use or lease under § 363", unless the property is of "inconsequential value or benefit to the estate." Thus, the trustee not only has the burden of showing that he will be able to use the property in question, he also has the burden of showing that the funds are not of inconsequential value and will benefit the estate.

**6.** By attaching as Exhibit "A", a Notice of Levy by the Indiana Dept. of Treasury, dated May 1, 1996, the Trustee has clearly attached the wrong exhibit. However, if such a Notice of Levy was filed, it may (without this Court so holding) be a lien junior to the Notice of Levy issued to Calumet National Bank by the IRS.

21, 1996, alleging it holds a total claim of $1,718,719.14 versus the Debtor's Estate, of which $1,311,145.23 is secured.

4. The Response by the Trustee to the U.S.A.'s Motion for Summary Judgment and Brief filed on March 27, 1997.

5. The U.S.A.'s Reply Brief in support of its Motion for Summary Judgment filed on April 11, 1997.

*STATEMENT OF MATERIAL FACTS FILED BY U.S.A. AND STATEMENT OF GENUINE ISSUES FILED BY TRUSTEE PURSUANT TO LOCAL BANKRUPTCY RULE B–756*

█ Local Bankruptcy Rule B–756, Motions for Summary Judgment, states as follows:

In addition to complying with the requirements of N.D. Ind. L.B.R. B–707.1, all motions for summary judgment shall be accompanied by a "Statement of Material Facts" which shall either be filed separately or as part of the movant's initial brief. The "Statement of Material Facts" shall identify those facts as to which the moving party contends there is no genuine issue and shall be supported by appropriate citations to discovery responses, depositions, affidavits, and other admissible evidence. Any party opposing the motion shall, within thirty (30) days of the date the motion is served upon it, serve and file a "Statement of Genuine Issues" setting forth all material facts as to which it is contended there exists a genuine issue, supported with appropriate citations to discovery responses, affidavits, depositions or other admissible evidence, together with any affidavits or other documentary material controverting the movant's position. The "Statement of Genuine Issues" may either be filed separately or as part of the responsive brief. In determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion, as supported by the depositions, discovery responses, affidavits and other admissible evidence on file.[7]

Pursuant to Local Rules, if a summary judgment respondent fails to file a timely statement of disputed material facts, uncontroverted statements in the moving party's statement in support of summary judgment are deemed admitted. *Giannopoulos v. Brach & Brock*, 109 F.3d 406, 412 (7th Cir. 1997) (collecting cases); *Wienco v. Katahn Associates, Inc.*, 965 F.2d 565, 567 (7th Cir. 1992); *Schulz v. Serfilco, Ltd.*, 965 F.2d 516, 518–19 (7th Cir.1992). However, the party opposing summary judgment is deemed to have admitted through failure to controvert, only those facts as set forth in the moving party's statement. *Wolf v. Buss (America), Inc.*, 77 F.3d 914, 922 (7th Cir.1996).

The U.S.A. on February 26, 1997 filed the following Statement of Material Facts as to

7. The United States Court of Appeals, Seventh Circuit, has endorsed the exacting obligation of Local Rules, such as Local Bankruptcy Rule B–756, which impose on a party contesting summary judgment to highlight which factual averments are in conflict as well as what record evidence there is to confirm the dispute, and explaining that the Courts are not obliged in our adversary system to scour the record looking for factual disputes, and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir.1994), (Citing, *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir.1989); *Bell, Boyd Lloyd v. Tapy*, 896 F.2d 1101, 1103–04 (7th Cir.1990)). The factual statements required by Local Rules are of significantly greater benefit to the Court than the parties, which does not have the advantage of the parties' familiarity with the record and often cannot afford the time combing the record to locate the relevant information. *Id.*, 24 F.3d at 923–24.

The decision whether to apply a Local Rule, such as set out above, requiring the Movant for Summary Judgment to file a Statement of Material Facts supported by appropriate citations, and requiring the opponent to file any material controverting the Movant's position strictly, or to overlook any transgressions, is one left to the trial court's discretion. *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir.1995); *Waldridge v. American Hoechst Corp.*, 24 F.3d at 923, *supra*, (Court may *sua sponte*, strictly enforce local rule governing nonmovant's response to summary judgment motion, even if movant's did not strictly comply with rule, and despite movant's failure to object to nonmovant's noncompliance with local rule).

which the U.S.A. contends there is no genuine issue of material fact:

On April 30, 1996, the United States issued a notice of levy against the bank account maintained by debtor at Calumet National Bank ("Calumet"). Notice of Levy attached herein at Exhibit 1. On May 7, 1996, the debtor filed its petition for relief under Chapter 7 of the bankruptcy code. Complaint at ¶ 1. On or about May 23, 1996, Calumet forwarded to the Internal Revenue Service a check in the amount of $1,903.01. Copy of Check attached herein at Exhibit 2. On September 25, 1996, Gordon E. Gouveia, Trustee of the estate of the debtor, filed the above referenced adversary proceeding seeking turnover of the levied funds. *See,* Complaint. The United States has a secured lien against debtor's property in the amount of $1,311,-145.23 as of the petition date. *See,* Proof of Claim filed on June 21, 1996 and attached herein at Exhibit 3.

The Notice of Levy by the IRS directed to the Calumet National Bank, ("The Bank") attached as Exhibit 1 to the U.S.A.'s Statement states in part as follows:

The internal Revenue Code provides that there is a lien for the amount that is owed. Although we have given the notice and demand required by the Code, the amount has not been paid. This levy requires you to turn over to us this person's property and rights to property (such as money, credits, and bank deposits) that you have or which you are already obligated to pay this person. However, don't send us more than the "Total Amount Due."

Money in banks, credit unions, savings and loans, and similar institutions described in section 408(n) of the internal Revenue Code *must be held for 21 calendar days,* from the day you receive this levy before you send us the money. Include any interest the person earns during the 21 days. Turn over any other money, property, credits, etc. that you have or are already obligated to pay the taxpayer, when you would have paid it if this person asked for payment.

Exhibit 2 to the IRS' Statement is a check dated May 23, 1996 from the Bank to the IRS in the sum of $1,903.01.

Exhibit 3 to the IRS' Statement, is the Proof of claim filed by the IRS that clearly shows that the prepetition assessments and notices of tax lien had been filed versus the Debtor prior to the Debtor's Petition, in the sum of $1,311,145.23.

The Trustee on March 27, 1997 filed the following Statement of Genuine issues as to which the Trustee contends there is a genuine issue of material fact:

On May 7, 1996, the Debtor filed for relief under Chapter 7 of the bankruptcy code. Gordon E. Gouveia, was appointed trustee on May 7, 1996 and has continued to act as such since that time. The § 341 Meeting was held on June 5, 1996, at which time the Trustee learned that there were funds located at Calumet National Bank which were property of the bankruptcy estate. However, upon further investigation, the Trustee discovered that the Internal Revenue Service (IRS) had seized said funds postpetition in violation of the automatic stay as evidenced by the check issued by Calumet National Bank. (Exhibit "1").

On August 13, 1996, the Trustee wrote to the IRS requesting turnover of the funds. (Exhibit "2"). The IRS refused to turnover said funds. (Exhibit "3"). Consequently, the trustee has had to incur the expense of filing a Complaint for Turnover.

The record reflects that the IRS was listed on the Debtor's Schedules and Matrix and that the § 341 Notice was mailed to the IRS on May 10, 1996. This is 13 days prior to the bank turning over the funds to the IRS. There is no evidence that the IRS attempted to notify Calumet National Bank to prevent the turnover of the prepetition levied funds.

The Court concludes that the facts set out in the U.S.A.'s Statement of Material Facts Which Are Undisputed are deemed admitted. However, this conclusion is not dispositive of the U.S.A.'s Motion as it does not follow that the U.S.A. is entitled to a summary judgment as a matter of law. The Court is required, at a minimum, to examine the movant's motion for summary judgment to ensure he has

discharged his initial burden. *Carver v. Bunch*, 946 F.2d 451, 454–55 (6th Cir.1991). The Court must make a further finding that given the undisputed facts, summary judgment is proper as a matter of law. *Wienco v. Katahn Associates, Inc.*, 965 F.2d at 568, *supra.*

## E

### *Judicial Notice*

The Court takes judicial notice of the record in the Debtor's main case, and finds as follows:

1. That the Debtor filed its voluntary Chapter 7 Petition on May 7, 1996.

2. That the Debtor in Schedule E—Creditors Holding Unsecured Priority Claims, list the IRS, Cincinnati, Ohio 45999, as a creditor in the sum of $1,200,000.00.

3. That the Notice of the Debtor's Petition to all creditors by the Clerk dated May 8, 1997, pursuant to the Certificate of Service, was served on all scheduled creditors, including the IRS in Cincinnati, Ohio, on May 10, 1997.

4. That the Bank was listed by the Debtor at Schedule B—Personal Property at No. 2, wherein two accounts were shown having a negative balance of $30.00, so that the Bank was not listed as a creditor of the Debtor in its Schedules. However, the Certificate of Service by the Bankruptcy Noticing Center on behalf of the Clerk giving notice of the Debtor's Petition dated May 10, 1997, reveals that the Bank was given official or formal notice of the Debtor's Petition at 5231 Hohman, Hammond, Indiana 46320.

5. That the Debtor's Statement of Affairs, No. 4. Suits and Administrative proceedings, executions, garnishments and attachments, No. 5, repossession, foreclosures and returns, and No. 11 Closed Financial Accounts do not list the Notice of Levy by the IRS.

According to Exhibit "1" to the IRS' Statement of Material Facts contained in its Brief in support of its Motion for summary Judgment, the Notice of Levy to the Bank by the IRS dated April 30, 1996, was issued by the IRS' local office located at 8398 Mississippi Street, Merrillville, Ind. 46410. Accordingly, because the Notice of the Debtor's Petition was mailed by the Clerk to the IRS in Cincinnati, Ohio, and the Notice of Levy was generated by the IRS' Merrillville Office, the record does not indicate if the Merrillville Office of the IRS had actual knowledge of the Debtor's Petition prior to the time that the Calumet National Bank issued its check dated May 23, 1996, in the sum of $1,903.01 to the IRS. (*See,* IRS Exh. No. "2").

## F

### *The Positions of the Parties*

**1. *The Motion and Brief of the IRS in Support of its Motion for Summary Judgment.***

The Motion of the U.S.A. acknowledges that on April 30, 1997, the IRS issued a Notice of Levy on the Debtor's bank account, and that the Debtor filed its Chapter 7 Petition on May 7, 1997. The U.S.A.'s Motion also acknowledges that on May 23, 1996, the Bank issued to the IRS a check in the sum of $1,903.01, and that on September 25, 1996, the Trustee made a demand for the turnover of these monies. However, the IRS asserts that since the IRS has a lien in the Debtor's property in the sum of $1,311,145.23 as of the Petition date, the Trustee has not, and cannot, provide anything that will adequately protect the IRS as to the funds in its possession.

The U.S.A.'s Brief in Support of its Motion for Summary judgment concedes that the IRS served a Notice of Levy versus the Debtor's bank account with Calumet National Bank, but argues that the I.R.S.' Notice of Levy and Receipt of the Funds from the Calumet National Bank did not violate the § 362 Automatic Stay of Proceedings in the Debtor's bankruptcy case because the Notice of Levy was served prepetition, and that the mere receipt of funds subsequent to the filing of the bankruptcy petition does not violate the automatic stay, *citing Camacho v. United States, (In re Camacho )*, 184 B.R. 807, 813 (Bankr.D.Alaska 1995) (retention of funds re-

ceived postpetition in honor of prepetition levy not a violation of § 362(h)).

The U.S.A. asserts that the Trustee has not established that he is entitled to the turnover of the funds levied upon by the U.S.A. pursuant to § 542(a),[8] and refers this court to § 363(e) which addresses the use, sale, or lease of property of the estate. Section 363(e) states as follows:

(e) Notwithstanding any other provision of this section, *at any time,* on request of an entity that has an interest in property proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.[9] (emphasis supplied).

The U.S.A. refers this Court to *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204, n. 7, 209–10, 103 S.Ct. 2309, 2313 n. 7, 2316, 76 L.Ed.2d 515 (1983) (holding that a court can order the United States to turn over property of the estate that is seized prepetition, but only after the court ensures that the IRS has adequate protection of its interest). In further support of its Motion, the IRS cites the following cases: *In re Hooper,* 152 B.R. 309, 310 (Bankr.D.Colo. 1993); *In re Colonial Center, Inc.,* 156 B.R. 452, 463 (Bankr.E.D.Pa.1993); *In re Richardson,* 135 B.R. 256, 259–60 (Bankr. E.D.Tex.1992) (collecting cases); *In re Tel–A–Communications Consultants, Inc.,* 50 B.R. 250, 252 (Bankr.D.Conn.1985); *In re Loof,* 41 B.R. 855, 856 (Bankr.E.D.Pa.1984); *In re Shapiro,* 124 B.R. 974, 982 (Bankr. E.D.Pa.1991); *In re Ayscue,* 123 B.R. 28, 29 (Bankr.E.D.Va.1990); *In re Robinson,* 89 B.R. 682, 683 (Bankr.S.D.Ohio 1988); *In re Ford,* 78 B.R. 729, 736 (Bankr.E.D.Pa.1987); *In re Cleveland Graphic Reproduction, Inc.,* 78 B.R. 819, 824 (Bankr.N.D.Ohio 1987); *In re Senlick,* 59 B.R. 296, 298 (Bankr.E.D.Pa. 1986); *In re McNeely,* 51 B.R. 816, 820 (Bankr.D.Utah 1985); *In re Aurora Cord and Cable Co.,* 2 B.R. 342, 346 (Bankr. N.D.Ill.1980), and, 3 Collier on Bankruptcy ¶ 542.02 at 542–1 (explaining that the Supreme Court in *Whiting Pools,* held that a creditor "may demand adequate protection as a condition precedent to turnover"). The U.S.A. then reminds the court that pursuant to § 363(*o*)(1), the Trustee has the burden of proof on the issue of whether the Trustee has provided the U.S.A. with adequate protection of their interest in the monies.

**2. *The Brief of Trustee in Response to the U.S.A.'s Motion for Summary Judgment.***

On March 27, 1997, the Trustee filed his Response to the United States' Motion for Summary Judgment and argues that all the monies held by the Bank in the Debtor's accounts on the date of the Debtor's Petition were property of the Debtor's estate, pursuant to § 541(a)(1), regardless of the IRS's prepetition levy. The Trustee points out the record in the Debtor's main case that the

---

**8.** Section 542(a) provides as follows:

(a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property *that the trustee may use, sell, or lease under section 363,* of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, *unless such property is of inconsequential value or benefit to the estate.* (Emphasis supplied).

**9.** It is also observed that § 363(c)(2), which is incorporated into § 542(a) provides as follows:
(2) The trustee may not use, sell, or lease cash collateral under paragraph ( 1) of this subsection unless—
(A) each entity that has an interest in such cash collateral consents; or
(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

In addition, § 363(c)(4) referred to in § 542 states as follows:
(4) Except as provided in paragraph (2) of this subsection, the trustee shall segregate and account for any cash collateral in the trustee's possession, custody, or control.
It is also noted that § 362(d) provides as follows:
(d) The trustee may use, sell, or lease property under subsection (b) or (e) of this section only to the extent not inconsistent with any relief granted under section 362(c), 362(d), 362(e), or 362(f) of this title.
Adequate protection that may be required pursuant to § 362(d), or § 363(e), is set out in § 361, which makes specific reference to §§ 362 and 363.
All of the above provisions are applicable to a case under Chapter 7 pursuant to § 103(a).

IRS was duly listed on its Schedules and Matrix, and the Notice of the Debtor's Petition was mailed to the IRS on May 10, 1996, or 13 days prior to the date the Bank turned the proceeds of the bank account over to the IRS, and that there in no evidence that the IRS ever attempted to notify Calumet National Bank to not turn over the funds to it.

The Trustee reminds the court that on the date of the Debtor's Petition, or May 7, 1996, the Debtor had two bank accounts with the Bank when the Bank was served with the IRS's Notice of Levy on April 30, 1996. The Trustee then reminds the court that the Bank cannot surrender the funds to the IRS in the Debtor's account until 21 days after the service of the Notice of Levy. 26 U.S.C. § 6332.

The Trustee asserts that the IRS' refusal to turn over the proceeds of the bank account until it receives adequate protection is not a valid reason to refuse to comply with the Trustee's turnover request, as the Bankruptcy Code provides the proper procedure to request adequate protection. In support of its position the Trustee refers this court to *In re HDI Partners*, 202 B.R. 524, 526–27 (Bankr.S.D.Fla.1996), where the court wrote:

> In *In re Challenge Air, Inc.*, the Eleventh Circuit expanded upon *Whiting Pools*, and found that accounts held by a third party subject to a prepetition tax levy remained property of the estate. 952 F.2d 384 (11th Cir.1992). The Eleventh Circuit determined that the prepetition levy only gave the IRS constructive possession of the right to payment associated with the account. The Eleventh Circuit decided that constructive possession of a right to payment does not preclude turnover under Section 542 because the prepetition levy falls to divest a debtor of ownership of the asset. *Id.*, at 387, *citing United States v. National Bank of Commerce*, 472 U.S. 713, 720–22, 105 S.Ct. 2919, 2924–25, 86 L.Ed.2d 565 (1985). *See In re National Center for the Employment of the Disabled*, 157 B.R. 291 (Bankr. W.D.Tex.1993). Accordingly, the Funds are property of the Debtor's estate despite the IRS's valid tax levy.

The IRS attempts to distinguish both *Whiting Pools*, and *Challenge Air*, from the instant case by contending that since both cases involve reorganization under Chapter 11 rather than liquidation under Chapter 7, there is no rehabilitative purpose to be achieved by requiring turnover. This argument is without merit. The trustee's strong arm powers are found under Chapter 5 of the Bankruptcy Code. The provisions of Chapter 5 apply to any case commenced under Title 11. Section 103(a) of the Bankruptcy Code explicitly states, "... chapters 1, 3, and 5 of this title apply in a case under chapter 7, 11 12, or 13 of this title." Therefore, under the plain meaning of Section 103(a), the turnover provisions of Section 542 apply to any bankruptcy case commenced under Title 11.

*Id.*, 202 B.R. at 526–27.

The Trustee argues that the funds in the two bank accounts on the date of the filing of the Debtor's Petition, or $1,928.01 should be turned over to the Trustee for administration. The Trustee also argues that the IRS violated the § 362 automatic stay because it failed to notify the Bank to prevent "execution of the levy" when in had notice of the bankruptcy and ample opportunity to cease collection efforts. The Trustee distinguishes the U.S.A.'s reliance on *In re Camacho*, 184 B.R. 807, *supra*, by referring to the following language of the *Camacho* court:

> The last issue to be addressed is whether the IRS has violated the automatic stay by receiving and refining the 1992 PFD postpetition. In the Order Granting, in Part, and Denying, in Part, Cross–Motions for Summary Judgment, filed December 2, 1994, I indicated that I did not feel the record reflected a willful violation of the automatic stay on the part of the IRS, but that I would further review this issue after trial. Considering the entire record, I conclude that the IRS has not willfully violated the automatic stay. The IRS conducted a valid levy against John Camacho's 1992 PFD prior to the time the Camachos filed bankruptcy. The State of Alaska remitted the PFD to the IRS postpetition in response to the levy. Under these circum-

stances, I find that the IRS's conduct does not entitle the Camachos to damages under 11 U.S.C. § 362(h).

*Id.*, 184 B.R. at 813. The Trustee points out that the *Camacho,* case holds that the IRS's conduct was not willful, and, not as the IRS argues, that the conduct did not violate the automatic stay. The Trustee then refers this court to the decision by the District Court in *Camacho,* on appeal, where the court noted:

The levy in question occurred prepetition on September 23, 1992. The Camachos filed their bankruptcy petition on September 30, 1992. The Government's receipt of the permanent fund dividend occurred postpetition in November 1992. Thus, the alleged willful violation is the failure to "turnover" the permanent fund dividend on request of the attorney for the Camachos. The bankruptcy court concluded that the Government did not commit a "willful" violation of the stay. Clearly, there was a **bona fide** dispute between the parties regarding whether the permanent fund dividend was "property of the estate" subject to turnover and therefore covered by the stay. The Ninth Circuit has indicated, however that such disputes do not prevent a violation from satisfying the "willfulness" requirement. (cite omitted) The Ninth Circuit appears to hold that where a creditor disputes the applicability of the stay to property in its possession, it must honor the stay and apply to the bankruptcy court for relief. *Id.* If it fails to honor the stay, it must pay damages and attorneys fees, even if it ultimately prevails. (cite omitted) On remand, the bankruptcy court should reconsider this issue in light of *Pinkstaff,* and if damages and attorneys fees are denied, make findings of fact and conclusions of law to enable meaningful review.

*Camacho v. United States,* 190 B.R. 895, 902 (D.Alaska 1995).

The Trustee then refers this court to *Matter of Fernandez,* 125 B.R. 317 (Bankr. M.D.Fla.1991), where the court stated:

As to the postpetition levy, this Court finds that such a levy is a technical breach of the automatic stay. The IRS took the appropriate action upon receiving notice and returning the funds to the Debtors. However, through the bureaucracy of the IRS, Debtors were deprived of such funds almost 90 days. It is the Court's belief the IRS has the duty to ensure that its prepetition or postpetition levies are not only neutralized upon notification of the bankruptcy, but the IRS must seek to turnover the funds seized quickly or seek adequate protection or relief from the automatic stay in the bankruptcy court. . . .

As to the postpetition seizure of funds predicated on the prepetition levy, the IRS has a duty to ensure such a levy does not function postpetition. There is no doubt in this case the IRS did deal with their postpetition levy while they disregarded the fact that they had a prepetition levy in existence which continued to function almost six months later. Under the facts in this case, the Court finds a violation of automatic stay as to the operation of a prepetition notice of levy and awards Debtors 11% interest from the date of seizure to the date of return of funds held by the U.S. Coast and Geodetic Survey plus attorney's fees. (Footnotes omitted).

*Id.*, 125 B.R. at 319.

On appeal, the District Court, affirming the Bankruptcy Court in part, declared:

In order for the automatic stay to have full effect, positive action on the part of the creditor may be required to halt the continuation of the garnishment. Accordingly, the creditors must release the lien within a reasonable period of time after notice of the bankruptcy and failure to do so is a violation of the automatic stay. *In re Carlsen,* 63 B.R. 706, 710 (Bkrtcy.C.D.Cal. 1986); *In re Baum,* 15 B.R. 538, 541 (Bankr.E.D.Va.1981). The "reasonable time period" is unique to each case and must be determined on a case by case basis. *In re Carlsen, supra,* 63 B.R. at 710.

In the instant case it is apparent that Appellant's actions were a willful violation of the automatic stay. Appellant not only filed a Notice of Levy postpetition, but also failed to timely release the prepetition levy. The I.R.S. must be charged with the knowledge of it's agents, and the size and

complexity of the I.R.S. does not excuse its disregard for the automatic stay. *In re Price,* 103 B.R. 989, 993 (Bkrtcy.N.D.Ill. 1989); *In re Santa Rosa Truck Stop,* 74 B.R. 641, 643 (Bkrtcy.N.D.Fla.1987); *In re Shafer, supra,* 63 B.R. at 198. According to the above cited case law, this type of action should not be tolerated and the Bankruptcy Court was correct in finding that a willful violation of the automatic stay had occurred.

*In re Fernandez,* 132 B.R. 775, 778–79 (M.D.Fla.1991). The Trustee also referred this court to *Matter of Toti,* 141 B.R. 126, 132 (Bankr.E.D.Mich.1992), where the Court stated:

> It is quite clear to the Court that applications of the law in the Sixth Circuit to either parties factual assertions indicates that the payments(s) seized by the IRS were postpetition and in violation of the stay.
>
> As a result of the IRS' violation of automatic stay. Toti seeks to hold the IRS in contempt and to recover his costs, interest and attorneys fees.
>
> Civil contempt sanctions may be imposed even if the absence of willfulness. *In re Shafer,* 63 B.R. 194 (Bankr.D.Kan. 1986). In addition, accidental, inadvertent or negligent conduct can be grounds for imposing civil contempt sanctions, and those sanctions may include attorney fees. *Id.*
>
> A stay violation is willful when the party acts with knowledge of the filing of the bankruptcy. In the present case, Toti filed his bankruptcy petition on February 21, 1990. On March 2, 1990, the IRS stated it received notice of the § 341 Hearing. However, the IRS did not release the levies until April 2, 1990.
>
> A creditor must release the levy within a reasonable period of time after notice of the bankruptcy. *In re Carlsen,* 63 B.R. 706, 710 (Bankr.C.D.Cal.1986). The Court concludes that the IRS did not act within a reasonable period of time in releasing the levies ... the IRS' receipt on March 2, 1990 of the notice of § 341 Hearing was its notice of the bankruptcy and the effect of the stay. *In re Price,* 103 B.R. 989

(Bankr.N.D.Ill.1989); *In re Wagner,* 74 B.R. 898 (Bankr.E.D.Pa.1987). The IRS must be charged with the knowledge of its agents. *Price,* at 993. The size and complexity of the IRS does not excuse its disregard for the automatic stay. *In re Santa Rosa Truck Stop, Inc.,* 74 B.R. 641, 643 (Bankr.N.D.Fla.1987).

*Id.,* 141 B.R. at 132.

The Trustee relies on the foregoing cases in arguing that the U.S.A.'s postpetition retention of the funds is in violation of the automatic stay. The Trustee reminds the court that the § 341 notice of the Debtor's Petition was mailed on May 10, 1996, and that since that date the U.S.A. has done nothing to turn over the funds to the Trustee.

The Trustee also asserts that the U.S.A. had the means to move for adequate protection of its interest in the funds pursuant to Fed.R.Bankr.P. 4001(a)(1), and that the IRS should have first turned the funds over to the Trustee, and *then,* filed its Motion for Adequate Protection. However, the Trustee asserts that the U.S.A. is not entitled to adequate protection of its interest in the funds relying on § 363(c) and (e) which state:

> (c)(1) If the business of the debtor is authorized to be operated under §§ 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.
>
> (2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
>
> \* \* \*
>
> (e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased by the trustee, the Court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate

protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property to the exclusion of such property being subject to an order to grant relief from the stay under Section 362.

The Trustee reminds the Court that he is not operating the Debtor's business under § 721, and thus, he is not using, selling, or leasing property of the Debtor's estate, but is collecting assets of the bankruptcy estate to be distributed to creditors pursuant to the priorities in the Bankruptcy Code, *citing In re Dant & Russell, Inc.*, 67 B.R. 360, 363 (D.Or. 1986). The Trustee admits that the U.S.A. is a secured creditor with a tax lien on certain property of the Debtor. However, the Trustee also refers this court to § 724(b), which states:

(b) Property in which the estate has an interest and that is subject to a lien that is not avoidable under this tide and that secured an allowed claim for a tax, or proceeds of such property, shall be distributed—

(1) first, to any holder of an allowed claim secured by a lien on such property that is not avoidable under this title and that is senior to such tax lien;

(2) second, to any holder of a claim of a kind specified in section 507(a)(1), 507(a)(2), 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, to the extent of the amount of such allowed tax claim that is secured by such tax lien;

(3) third, to the holder of such tax lien, to any extent that such holder's allowed tax claim that is secured by such tax lien that exceeds any amount distributed under paragraph (2) of this subsection; ...

It is clear that § 724(b) provides that the tax liens of the IRS are subordinated not only to holders of senior liens that are not available, but also to § 507(a), (1) through (a)(7) unsecured priority claims, and § 507(a)(1) Chapter 7 administrative expenses.

The Trustee then refers the court to *In re Bino's Inc.*, 182 B.R. 784, 787–90 (Bankr. N.D.Ill.1995), where the court upheld the Chapter 11 Trustee's objection to an interim cash collateral order which gave the tax creditor a superpriority administrative claim pursuant to § 506(b) because the order would violate § 724(b) in the event that the case converted to a chapter 7. The Trustee quotes the *Bino's,* court as follows:

The effect of § 724(b) is to allow a Chapter 7 trustee to liquidate property subject to tax liens and distribute the proceeds to the priority claimants enumerated in § 507(a)(1) through § 501(a)(6) prior to any distribution to taxing authorities....

The only parties affected by the operation of § 724(b) are the priority claimants and the tax lien creditors. *See* 4 Collier on Bankruptcy, ¶ 724.03, pp. 724–6. Section 724(b)(2) subordinates the claims of a tax lien holder, up to the amount of its lien, to the claims of the kind specified in §§ 507(a)(1)–(6). Section 724(b) allows a trustee to use the liquidated value of the collateral securing the tax lien to satisfy these priority creditors. *See* 4 Collier on Bankruptcy, ¶ 724.03, pp. 724–6–8. If such priority creditors do not entirely deplete the tax lien, the holder of the tax lien is, of course, entitled to the remaining proceeds. § 724(b)(3).... The legislative history indicates that Congress made a policy decision to favor the claims of wage earners, the costs of administration of the estate, and other priority claims over tax liens. H.R.Rep. No. 686, 89th Cong., 1st Sess. (1965), U.S.Code & Admin.News at 2442, 2462.

In *In re Life Imaging Corp.*, 131 B.R. 174 (Bankr.D.Colo.1991), the court essentially held that a cash collateral order may not be enforced if it violated the subordination provision of § 724(b). *See Life Imaging*, 131 B.R. at 177.... The Court found that the IRS's argument was nothing more than an attempt to give the cash collateral order precedence over § 724(b) and summarily rejected the argument. *Id.,* at 177....

This Court agrees with the plain reading given to § 724(b) in *Life Imaging*. Although the precise distribution order of tax liens pursuant to § 724(b) is initially difficult to grasp, there can be no doubt that the purpose of the statute is to subordinate tax liens to the interest of other priority creditors. The subordination of tax liens

can result in harsh treatment for taxing authorities, but the congressional intent is clear. "If the statute is clear and unambiguous 'that is the end of the matter, for the court .... must give effect to the unambiguously expressed intent of congress'..." *Board of Governors, FRS v. Dimension Financial Corp.*, 474 U.S. 361, 368, 106 S.Ct. 681, 685, 88 L.Ed.2d 691 (1986) *quoting Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Cash collateral agreements that effectively operate to take precedence over § 724(b) are unenforceable....

If the Taxing Authorities were faced with a diminution in the value of their collateral resulting from the automatic stay, they would be entitled to § 507(b) superpriority. However, what the Taxing Authorities essentially seek is a superpriority for the entire amount of the tax liens because of § 724(b) may result in the subordination of that amount of their claims. Section 507(b) does not permit a superpriority for a diminution in value due to the distribution scheme of § 724(b)....

*Id.*, 182 B.R. at 787–90.

The Trustee argues that the U.S.A.'s demand for adequate protection violates the distribution scheme of § 724, by allowing the U.S.A. to receive more than it would be entitled to under § 724. The Trustee refers this court to *In re Wolensky's Ltd. Partnership*, 163 B.R. 629, 636–37 (Bankr.D.Colo. 1994), where the court stated:

A levy gives the IRS a superior right, as against the taxpayer, in any fund or account receivable levied upon. But that superior right does not terminate the taxpayer's equitable interest in the property. At most, for various obvious practical reasons, it may usually defeat the taxpayer's ability to enjoy the fruits of that right. With the intervention of a Chapter 11 bankruptcy case under Chapter 11 of the Bankruptcy Code the trustee (or a debtor-in-possession) has a basis for enjoying that right and employing the proceeds in the debtor's business by providing the government's lien adequate protection (for example, by posting replacement collateral). Similarly, in Chapter 7 the trustee is entitled to employ the proceeds to advance the congressional policies concerning tax liens embodied in 11 U.S.C. §§ 724 and 726(a)(4)....

Because the funds are subject to federal tax liens, those liens are entitled to adequate protection. The trustee shall be required, pending further order in the main case, to keep the funds in an interest-bearing insured account separate from other estate funds unless the United States and the trustee agree otherwise. Beyond that, no further adequate protection is necessary. The tax liens will give the government's non-penalty tax claims priority over general unsecured creditors and over tax creditors holding only unsecured claims entitled to priority under 11 U.S.C. § 507(a)(7). But by virtue of 11 U.S.C. § 724(b), the funds will be available to pay administrative and other nontax priority claims first and by virtue of 11 U.S.C. §§ 724(a) and 726(a)(4) any penalty claims secured by the tax liens will be paid only after other claims in the case.

Subjecting the tax liens to §§ 724 and 726(a)(4) does not deprive the tax liens of adequate protection. *Contra, Sigmund London*, 139 B.R. at 772. It is simply an application of the funds that are subject to the liens in accordance with congressional intent. To hold that the requirement of adequate protection in 11 U.S.C. § 363(e) prevents the use of 11 U.S.C. §§ 724 and 726(a)(4) would render those latter sections a nullity, an absurd result that Congress could not have intended. Instead, I view §§ 724 and 726(a)(4) as illustrating that the debtor's ownership of an account receivable levied upon by the IRS can have significant meaning despite the relatively hollow quality that such ownership interest might have outside bankruptcy.

*Id.*, 163 B.R. at 636–37. The Trustee also refers this court to *In re A.G. Van Metre, Jr., Inc.*, 155 B.R. 118, 121 (Bankr.E.D.Va. 1993); *In re Grand Slam U.S.A., Inc.*, 178 B.R. 460, 461 (E.D.Mich.1995).

The Trustee then points out that based on the facts of the case, and the size of the

administrative and wage claims, that it would be unlikely that the U.S.A. on behalf of the IRS would be entitled to a distribution from the Debtor's estate. The Trustee notes that the priority wage claims total $63,467.56, and the Trustee has collected approximately $45,-000.00 for distribution to creditors. The Trustee argues that given this factual scenario that the U.S.A. is not entitled to adequate protection, because it will probably not receive a distribution from the Debtor's estate, as the monies on hand by the Trustee will not ever pay priority wage claimants and administrative expenses, and if adequate protection payments to the IRS were required by the Trustee, this would only decrease the monies available to pay priority wage claimants, and in effect transfer funds to the IRS, it is not entitled to under § 724(b).

### 3. U.S.A.'s Reply Brief in Support of its Motion for Summary Judgment:

The U.S.A. asserts that the requirements of § 363, that a lienholder be provided with adequate protection for his lien interest is not separate and apart from the question of turnover, and the property in issue is cash collateral that the Trustee is prohibited from using without either the consent of the United States or after notice and hearing pursuant to § 363(c)(2).

The U.S.A. also asserts that the fact that the Trustee is not operating the Debtor's business pursuant to § 721, does not mean that the Trustee is not required to provide adequate protection for the IRS' tax lien interest in the funds.

The U.S.A. next asserts that the Trustee's "implicit assumptions" that the distribution of assets of the Debtor's estate by the Trustee to pay other creditors, including administrative expenses is not a "use" of property is incorrect, citing, In re Quality Beverage Co. Inc., 181 B.R. 887, 896–97 (Bankr.S.D.Tex. 1995), and In re Addison Properties Limited Partnership, 185 B.R. 766, 767 (Bankr. N.D.Ill.1995) (Cash collateral may appropriately be used to pay administrative expenses if the interest secured by the cash collateral is adequately protected, not otherwise).

The U.S.A. does not dispute that under § 724(b), the U.S.A. is subordinated to senior lienholders, and § 507(a) unsecured priority creditors, but asserts that this distribution scheme does not preclude the U.S.A. from receiving adequate protection for its lien interest. The U.S.A. asserts that the fact that the monies collected so far by the Trustee are not sufficient to pay all wage claims, does not support the Trustee's assertion, that the U.S.A. may receive nothing, and thus, is not entitled to adequate protection, as the relevant comparison in between the amount of claims that will have priority over the claim of the U.S.A. and the funds that will ultimately be available to pay those claims.

The U.S.A. then responds to the Trustee's assertion that the U.S.A. has violated the automatic stay, by arguing that the inaction by the U.S.A. does not amount to a violation of the automatic stay. The U.S.A. argues that the authorities referred to by the Trustee do not mandate a finding that the U.S.A. violated the automatic stay. The U.S.A. distinguishes the cases cited by the Trustee based on the distinguishable facts upon which the opinions cited by the Trustee are based.

The U.S.A. admits that the Trustee correctly notes that in In re Camacho, 184 B.R. 807 (Bankr.D.Alaska 1995) held that the IRS retention of funds received postpetition, pursuant to a valid prepetition levy, did not violate section 362(h), and that the district court remanded to the bankruptcy court, for a making of findings of fact and conclusions of law, the issue of whether the retention of funds by the IRS violated § 362(h). Camacho v. United States, 190 B.R. 895, 902 (D.Alaska 1995). However, the IRS points out that what the Trustee failed to note is that the district court also found that "[s]ection 363(e) requires that any property turned over in which the creditor has a security interest shall assure adequate protection to the creditor." Camacho, 190 B.R. at 902, n. 11.

The U.S.A. asserts that an examination of the circumstances surrounding the rulings in the cases cited by the Trustee shows that the case of In re Fernandez, is readily distinguishable as the prepetition levy the court found should have been released after receiving notice of the bankruptcy, was a continu-

ing wage levy that operated as a new levy on postpetition funds for nearly six (6) months after the bankruptcy petition was filed and nearly five(s) months after the IRS received notice of the filing. *In re Fernandez*, 125 B.R. 317, 319 (Bankr.M.D.Fla.1991). The U.S.A. also points out that in *Matter of Toti*, the levy was actually issued postpetition. *Matter of Toti*, 141 B.R. 126, 128 (Bankr. E.D.Mich.1992), while in this case, the levy was a one-time levy on a bank that was validly issued prepetition, which gave the IRS constructive possession of the funds in the bank account.

The U.S.A. refers this court to *United States v. National Bank of Commerce*, 472 U.S. 713, 720, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565 (1985) ("[i]n contrast to the lien-foreclosure suit, the levy does not determine whether the Government's right to the seized property are superior to those of other claimants; it, however, does protect the Government against diversion or loss while such claims are being resolved."), and *Phelps v. United States*, 421 U.S. 330, 337, 95 S.Ct. 1728, 1732–33, 44 L.Ed.2d 201 (1975) (Government served a notice of levy upon cash assets of the debtor held by an assignee for the benefit of creditors, the court held that the service of the notice of levy upon cash assets of the debtor held by the assignee was a transfer of possession sufficient to oust the summary jurisdiction of the bankruptcy court.). The U.S.A. acknowledges that *Whiting Pools*, has limited *Phelps*, but did not

overrule the doctrine that a Notice of Levy accords the IRS with constructive possession.

### G

***Whether funds in the Debtor's bank account which were subject to a Prepetition Notice of Levy by the IRS, but not turned over by the Bank to the IRS until Postpetition, are property of the Debtor's bankruptcy estate on the date of the filing of the Debtor's petition?***

**1. Property of the Estate pursuant to § 541.**

The initial inquiry is whether the subject funds represent property of the Debtor's bankruptcy estate on the date of the filing of the Debtor's Chapter 7 Petition. This is because the Trustee cannot compel the turnover of funds under § 542 when the Debtor has no present right thereto because the Trustee's claim is no greater than the Debtor's claim at the time of filing. *In re Lyons*, 957 F.2d 444, 445 (7th Cir.1992) (collecting cases). Section 541(a) of title 11 provides as follows:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.[10]

**10.** As a general matter, Congress in enacting the Bankruptcy Code intended a broad range of property to be included in the debtor's estate pursuant to 11 U.S.C. § 541. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203–05, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983). The question of whether a debtor's interest in property is "property of the estate" in a federal question to be decided by federal law. *In re Marrs–Winn Co., Inc.*, 103 F.3d 584, 591 (7th Cir.1996); *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1343 (7th Cir.1987). The determination of what property rights the debtor has on the petition date is created and defined by state law, unless some federal interest requires a different result. *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *Barnhill v. Johnson*, 503 U.S. 393, 397–98, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992); *UNR Indus., Inc. v. Continental Casualty Co.*, 942 F.2d 1101, 1103 (7th Cir.1991), *cert. den.*, 503 U.S.

971, 112 S.Ct. 1586, 118 L.Ed.2d 305 (1992); *Koch Refining v. Farmers Union Cent. Exchange*, 831 F.2d 1339, 1343 (7th Cir.1987); *Matter of Jones*, 768 F.2d 923, 927 (7th Cir.1985).

The scope of "property" under § 541 is necessarily limited to the property owned by the debtor at the commencement of the case. *Matter of Carousel International Corporation*, 89·F.3d 359, 361 (7th Cir.1996) (*citing, Matter of Wayco, Inc.*, 947 F.2d 1330, 1333 (7th Cir.1991)). However, the bankruptcy estate does not "own" property solely because the estate has a claim of ownership; the estate's property does not include the things to which it lays claim until the matter is adjudicated and resolved by the parties. *Id.*, 89 F.3d at 362.

Section 541(a)(1) of the Code changed the legal landscape by dramatically expanding the definition of property included in the estate. *Matter of Geise*, 992 F.2d 651, 655 (7th Cir.1993). Sec-

The Code does not define "property", and makes no distinction between tangible real or personal property and intangible personal property. In addition § 542(a) provides as follows:

> (a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

Again, "property" is not defined in § 542(a), and this section makes no distinction between tangible real or personal property and intangible personal property.

Section 101(15) provides that an "entity" as referred to in § 542(a) includes a "governmental unit". Section 101(27), provides that a "governmental unit" includes the United States and any department, agency, or instrumentality of the United States. Thus, § 542(a) is applicable to the IRS.

It should also be noted that § 103(a) provides that, except as provided in § 1161, Chapters 1, 3, and 5 of Title 11 apply in cases under Chapter 7, 11, 12, and 13 of Title 11. Thus, §§ 541, 542, and 363, are fully applicable to this Chapter 7 case.

 The trustee succeeds to and has exclusive control over all assets of the estate, including causes of action. *In re Smith,* 640 F.2d 888, 892 (7th Cir.1981); *Anderson v. St. Paul Mercury Indemnity Co.,* 340 F.2d 406, 409 (7th Cir.1965) (Act case). However, the estate's rights are limited to those had by the debtor, i.e., "whatsoever rights a debtor had at the commencement of the case continue in bankruptcy—no more, no less." *Matter of Jones,* 768 F.2d at 927, *supra,* (*quoting,*

*Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1213 (7th Cir.1984)). Thus, the filing of a bankruptcy petition does not expand or change a debtor's interest in an asset; it merely changes the party who holds that interest. *Matter of Sanders,* 969 F.2d 591, 593 (7th Cir.1992). A trustee takes property subject to the same restrictions that existed at the commencement of the case, and to the extent an interest is limited in the hands of a debtor, it is equally limited as property of the estate. *Id.,* Thus, any defense, legal or equitable, which might have been raised against the debtor may be raised against the trustee. 5 *Collier on Bankruptcy,* ¶ 541.04 at pp. 541–11 (L. King revised 15th ed.1997). The trustee is "subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149, 1154 (3rd Cir.1989) (*quoting,* 2 Collier on Bankruptcy, ¶ 323.02(4)).

It is clear that absent the IRS' Lien and its prepetition Notice of Levy, the Debtor's Bank Account would clearly have been property of the Debtor's estate pursuant to § 541(a), as of the Petition date as an intangible property right, under Indiana law. *See Myles v. Flora,* 462 N.E.2d 1319, 1320–21 (Ind.App.1984); *Matter of Hansen,* 101 B.R. 33, 34 (Bankr.N.D.Ind.1988). As observed by the Court in *Myles:*

> Intangible personal property is property which has no intrinsic value but is merely representative or evidence of value, such as stock certificates, bonds, or promissory notes. 73 C.J.S. *Property* 5 (1951). The relationship between a bank and a depositor is ordinarily that of debtor and creditor. *City National Bank of Auburn v. Brink* (1933) 98 Ind.App. 275, 187 N.E. 689; *State ex rel. Board of Finance of Washington Township v. Aetna Casualty* (1934) 100 Ind.App. 46, 189 N.E. 536. A

---

tion 541 eliminated the requirement that property must be transferable or subject to process in order to become initially part of the estate. *Id.,* Every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative is within the reach of § 541. *Matter of Yonikus (Yonikus II),* 996 F.2d 866, 869 (7th Cir.1993). Thus, upon the commencement of a

bankruptcy case, all property in which the debtor had a legal or equitable interest becomes property of the bankruptcy estate. *Matter of Kazi, M.D.,* 985 F.2d 318, 320 (7th Cir.1993). *See e.g., Matter of Yonikus (Yonikus I),* 974 F.2d 901, 905 (7th Cir.1992) (Debtor's potential personal injury claim was property of estate).

debt is a chose in action, as opposed to a chose in possession. Black's Law Dictionary 305 (rev. 4th ed.1968).

*Id.,* 462 N.E.2d at 1320.

### 2. The Scope and Extent of an IRS Tax Lien in Property of Debtor.

This court in *In re McDaniel,* Bankr. No. 83–60725, slip op. at pp. 3–6 (Bankr.N.D.Ind. August 1, 1988) described the extent of a federal tax lien as follows:

In the application of a Federal Revenue Act, state law controls in determining the nature of the legal interest which the taxpayer had in the property sought to be reached by the statute. *Aquilino v. United States,* 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960). *United States v. Brosnan,* 363 U.S. 237, 80 S.Ct. 1108, 4 L.Ed.2d 1192 (1960); *Wagner v. United States,* 573 F.2d 447 (7th Cir.1978) (Ind. law); *United States v. Stonehill,* 702 F.2d 1288 (9th Cir.1983).

In matters of substance, the government's lien does not exceed the rights of the taxpayer. In other words, the rights of the government can rise no higher than those of the taxpayer whose property is sought to be levied upon. *Avco Delta Corporation Canada, Ltd. v. United States,* 459 F.2d 436 (7th Cir.1972). In *United States v. Bess,* 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135 (1958), the Supreme Court stated that the federal tax lien provision "creates no property rights but merely attaches consequences, federally defined, to rights created under state law." In *Bess,* the Supreme Court held that the cash surrender value of an insurance policy owned by a taxpayer was property for tax lien purposes even though under state law it was not subject to creditor's liens. The Court held that once it has been determined that state law creates sufficient interests in the insured taxpayer in the insurance policy to satisfy the requirements of property under the federal tax lien statute, state law is inoperative to prevent the attachment of liens created by federal statutes in favor of the United States.

A tax lien created by 26 U.S.C. § 6321 covers all property owned by a delinquent tax payer both at the time the lien arises and thereafter until it is paid. *United States v. Union Central Life Insur. Co.,* 368 U.S. 291, 82 S.Ct. 349, 7 L.Ed.2d 294 (1961). Thus, the lien extends to after-acquired property. *Glass City Bank v. United States,* 326 U.S. 265, 66 S.Ct. 108, 90 L.Ed. 56 (1945).

It has also been held that a federal tax lien may attach to the rights of a taxpayer under a contract. *See e.g., Seaboard Surety Co. v. United States,* 306 F.2d 855, 859 (9th Cir.1962); *Atlantic National Bank v. United States,* 210 Ct.Cl. 340, 536 F.2d 1354, 1356 (Ct.Cl.1976); *Valley Bank of Nevada v. City of Henderson,* 528 F.Supp. 907 (D.Nev.1981).

\* \* \*

A tax lien created pursuant to 26 U.S.C. § 6321 upon all property of a defaulting taxpayer attaches to the proceeds of sale of that property. *Phelps v. United States,* 421 U.S. 330, 95 S.Ct. 1728, 44 L.Ed.2d 201 (1975).

The Supreme Court in *Phelps,* stated:

[A federal tax lien] attache[s] to the proceeds of the sale. *See Sheppard v. Taylor,* 5 Pet. 675, 710, 8 L.Ed. 269 (1831); *Loeber v. Leininger,* 175 Ill. 484, 51 N.E. 703 (1898). "The lien reattaches to the thing and to whatever is substituted for it...." The owner and the lien holder, whose claims have been wrongfully displaced, may follow the proceeds wherever they can distinctly trace them. 421 U.S. at 334–35, 95 S.Ct. at 1731 (Footnote omitted).

The transfer of property subject to attachment of a federal tax lien does not affect the lien, it being the very nature and essence of the lien, that the property no matter into whose hands it goes, passes *cum onere.* *United States v. Bess,* 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135, *supra.*

It is also noted that at 26 U.S.C. § 6331(b) regarding levy and distraint, it is provided that, "in any case in which the Secretary may levy upon property or

rights to property, he may seize and sell such property or rights of property (whether real or personal, tangible or *intangible* )". (Emphasis supplied). The determination of whether a taxpayer has an interest in property so that it may be subject to levy is governed by state law. *Wagner v. United States,* 573 F.2d 447 (7th Cir.1978). A levy may be made on intangibles. The contractual right to receive property is equivalent of a right to property. *United States v. Augspurger,* 452 F.Supp. 659 (W.D.N.Y.1978); *St. Louis Union Trust Co. v. United States,* 617 F.2d 1293 (8th Cir.1980).

*Id.,* slip op. at pp. 3–6.

With reference to property subject to a federal tax lien, this court in *Chael v. Whyte,* Adv. P. 90–6115, slip op. at 25 (Bankr. N.D.Ind. October 9, 1992) noted:

In matters of substance, the government's tax lien cannot exceed the right, title, and interest of the taxpayer in the property asserted to be subject to the tax lien. In other words, the rights of the government can rise no higher than those of the taxpayer whose property is sought to be levied upon. *Chicago Mercantile Exchange v. United States,* 840 F.2d 1352 (7th Cir.1988) (Tax lien attaches to taxpayer's interest in proceeds, but to nothing beyond that interest); *Avco Delta Corporation Canada, Ltd. v. United States,* 459 F.2d 436 (7th Cir.1972). In *United States v. Bess,* 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135 (1958), the Supreme Court stated that the federal tax lien provision "creates no property rights but merely attaches consequences, federally defined, to rights created under state law." In *Bess,* the Supreme Court held that the cash surrender value of an insurance policy owned by a taxpayer was property for tax lien purposes even though under state law it was not subject to creditors' liens. The Court held that once it has been determined that state law creates sufficient interests in the insured taxpayer in the insurance policy to satisfy the requirements of property under the federal tax lien statute, state law is inoperative to prevent the attachment of liens created by federal statutes in favor of the United States.

*Id.,* slip op. at 25. This court continued:

The scope of the federal tax lien is prescribed by 26 U.S.C. § 6321, which states the following:

If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition there) *shall be a lien,* in favor of the United States *upon all property and rights to property, whether real or personal, belonging to such person.* (Emphasis added).

The general rule is that a federal tax lien versus a Debtor-taxpayer is a "secret lien" in the Debtor's property which arises or "attaches" "at the time the assessment is made." 26 U.S.C. § 6322. That the government might not file a notice of tax lien until some future date, if at all, does not effect the immediate attachment of a tax lien when liability has been admitted or assessed. *Sgro v. United States,* 609 F.2d 1259 (7th Cir.1979). A tax lien normally takes precedence over other liens arising subsequent to assessment of the delinquent tax. *J.D. Court v. United States,* 712 F.2d at 261, *supra.* However, § 6323(a) provides protection to certain interests even if a notice of a tax lien imposed by § 6321 has been filed pursuant to § 6323(f).

Section 6323(a) creates an exception to § 6322's rule that a federal tax lien generally attaches at the time the delinquent tax is assessed. *J.D. Court v. United States,* 712 F.2d at 261, *supra.* Under 6323(a) when the "holder of a security interest" also claims an interest in property subject to a federal tax lien, the federal tax lien is deemed to have attached when the IRS files notice of the tax lien, rather than when the delinquent tax was first assessed. *Id.* Thus, the holder of a security interest in the taxpayer's property will prevail against a government tax lien if the security interest "attaches", and is perfected before the government files its notice of tax

lien. *Id.* In addition, § 6323(c) provides for the protection of certain security interests that come into existence after a tax lien is filed relating to a "commercial transactions financing agreement", as to certain types of "qualified property" as defined therein.

\* \* \* \* \* \*

A tax lien created by 26 U.S.C. § 6321 covers all property owned by a delinquent tax payer both at the time the lien arises and thereafter until it is paid. *United States v. Union Central Life Insur. Co.,* 368 U.S. 291, 82 S.Ct. 349, 7 L.Ed.2d 294 (1961).

*Id.,* slip op. at 40–45. (footnote omitted).

### 3. *The Rights and Interest of a Prepetition Debtor in a Bank Account that has been subject to a Prepetition Notice Levy by the IRS.*

The I.R.C. defines the rights and interest of the taxpayer-debtor following a Notice of Levy. Pursuant to § 6335(a), as soon as practicable after seizure of property, notice in writing of the seizure must be given to the owner of the property. Section 6335(b) mandates that as soon as practicable after the seizure of property, notice of the sale of the property seized must be given to the owner. Under § 6337(a), the debtor has the right to redeem the property prior to sale; for real property, the redemption right continues for 180 days following the sale. § 6337(b). The debtor has the right to any surplus proceeds after the payment of the delinquent tax and expenses under § 6342.

However, a special rule applies to bank accounts that are levied upon by the IRS. Section 6332(c) provides as follows: "Any bank (as defined in Section 408(n)) shall surrender (subject to an attachment or execution under judicial process) any deposits (including interest thereon) in such bank only 21 days after service of levy." Section 6332(c) is implemented by 26 C.F.R. § 301.6332–3, which provides, in part, as follows:

§ 301.6332–3 The 21–day holding period applicable to property held by banks.

(a) **In general.** This section provides special rules relating to the surrender, after 21 days, of deposits subject to levy which are held by banks. The provisions of § 301.6332–1 which relate generally to the surrender of property subject to levy apply, to the extent not inconsistent with the special rules set forth in this section, to a levy on property held by banks.

\* \* \* \* \* \*

(c) **21–day holding period—(1) In general.** When a levy is made on deposits held by a bank, the bank shall surrender such deposits (not otherwise subject to an attachment or execution under judicial process) only after 21 calendar days after the date the levy is made. The district director may request an extension of the 21–day holding period pursuant to paragraph (d)(2) of this section. During the prescribed holding period, or any extension thereof, the levy shall be released only upon notification to the bank by the district director of a decision by the Internal Revenue Service to release the levy. If the bank does not receive such notification from the district director within the prescribed holding period, or any extension thereof, the bank must surrender the deposits, including any interest thereon as determined in accordance with paragraph (c)(2) of this section (up to the amount of the levy), on the first business day after the holding period, or any extension thereof, expires. See § 301.6331–1(c) to determine when a levy served by mail is made. (2) **Payment of interest on deposits.** When a bank surrenders levied deposits at the end of the 21–day holding period (or at the end of any longer period that has been requested by the district director), the bank must include any interest that has accrued on the deposits prior to and during the holding period, and any extension thereof, under the terms of the bank's agreement with its depositor, but the bank must not surrender an amount greater than the amount of the levy. If the deposits are held in a noninterest bearing account at the time the levy is made, the bank need not include any interest on the deposits at the end of the holding period, or any extension thereof, under this paragraph. Interest that accrues on deposits

and is surrendered to the district director at the end of the holding period, or any extension thereof, is treated as a payment to the bank's customer.

\* \* \* \* \* \*

(3) **Transactions affecting accounts.** A levy on deposits held by a bank applies to those funds on deposit at the time the levy is made, up to the amount of the levy, and is effective as of the time the levy is made. No withdrawals may be made on levied upon deposits during the 21–day holding period, or any extension thereof.

(4) **Waiver of 21–day holding period.** A depositor may waive the 21–day holding period by notifying the bank of the depositor's intention to do so. Where more than one depositor is listed as the owner of a levied account, all depositors listed as owners of the account must agree to a waiver of the 21–day holding period. If the 21–day holding period is waived, the bank must include with the surrendered deposits a notification to the district director of the waiver.

(5) **Examples.** The provisions of this paragraph (c) may be illustrated by the following examples:

**Example 1.** On April 2, 1992, a notice of levy for an unpaid income tax assessment due from A in the amount of $10,000 is served on X Bank with respect to A's savings account. At the time the notice of levy is served, X Bank holds $5,000 in A's interest-bearing savings account. On April 24, 1992, (the first business day after the 21–day holding period) X Bank must surrender $5,000 plus any interest that accrued on the account under the term of A's contract with X Bank up through April 23, 1992, (the last day of the holding period).

\* \* \* \* \* \*

(d) **Notification to the district director of errors with respect to levied upon bank accounts**—(1) In general. If a depositor believes that there is an error with respect to the levied upon account which the depositor wishes to have corrected, the depositor shall notify the district director to whom the assessment is charged by telephone to the telephone number listed on the face of the notice of levy in order to enable the district director to conduct an expeditious review of the alleged error. The district director may require any supporting documentation necessary to the review of the alleged error. The notification by telephone provided for in this section does not constitute or substitute for the filing by a third party of a written request under § 301.6343–1(b)(2) for the return of property wrongfully levied upon.

(2) **Disputes regarding the merits of the underlying assessment.** This section does not constitute an additional procedure for an appeal regarding the merits of an underlying assessment. However, if in the judgment of the district director a genuine dispute regarding the merits of an underlying assessment appears to exist, the district director may request an extension of the 21–day holding period.

4. *Discussion of Cases deciding whether or not the Debtor has a Property Interest in a Bank Account as of the Date of its Petition when the IRS has Issued a Prepetition Notice of Levy to the Bank, and the Bank Paid the Proceeds of the Bank Account to the IRS Postpetition*

The United States Supreme Court in the seminal case of *U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 211, 103 S.Ct. 2309, 2317, 76 L.Ed.2d 515 (1983), held that pursuant to § 541(a), the debtor's estate included *tangible personal property* of the debtor which had been seized by the I.R.S. prior to the filing of the petition for reorganization. The Court found that the seizure of the tangible personal property did not transfer ownership to the I.R.S., only possession, and ownership of property is transferred only when the property in sold to a bona fide purchaser at a tax sale. *Id.,* 462 U.S. at 211–12, 103 S.Ct. at 2317, (citing *Bennett v. Hunter,* 9 Wall. 326, 336, 19 L.Ed. 672 (1870), and 26 U.S.C. § 6339(a)(2), which provides that a certificate of sale of property other than real property shall transfer to the purchaser all right, tide and interest of the party delinquent in and to the property sold). It in accepted that *Whiting Pools, Inc.,* has settled the right of a

debtor under § 542(a) to obtain the turnover of *tangible personal property*, physically seized by the I.R.S. pursuant to a prepetition Notice of Levy. However, there is a split of opinion over whether § 542(a) requires the turnover of cash received by the IRS from the debtor's bank pursuant to a prepetition Notice of Levy by the IRS on the debtor's bank account, which is *intangible personal property*. Cash is a unique asset in that cash need not be sold after it is seized in order to apply the proceeds to the tax debt of the taxpayer. *See* I.R.C. § 6335 (Sale of Seized Property). The threshold issue here is whether the ownership of the funds in a Debtor's bank account was transferred to the IRS when the Prepetition Notice of Levy was served on a Bank by the IRS, so that the proceeds thereof are not property of the Debtor's estate as of the Petition date pursuant to § 541(a).

In resolving this issue, the Court believes it is important to note certain observations made by Justice Blackmun in *United States v. Whiting Pools, Inc.* Justice Blackmun noted that while there are explicit limitations on the reach of § 542(a), none require that the debtor hold a possessory interest in the property at the commencement of the case. *Id.*, 462 U.S. at 205–07, 103 S.Ct. at 2314. Justice Blackmun also observed that under the old Bankruptcy Act, a bankruptcy court's summary jurisdiction over a debtor's property was limited to property in the debtor's possession when the petition was filed. *Id.*, 462 U.S. at 206 n. 13, 103 S.Ct. at 2314 n. 13 (*citing, Phelps v. United States*, 421 U.S. 330, 335–36, 95 S.Ct. 1728, 1731–32, 44 L.Ed.2d 201 (1975)). *Phelps*, was a case that involved a liquidation under the prior Bankruptcy Act, wherein the Supreme Court held that the bankruptcy court lacked jurisdiction to direct the IRS to turn over the property which had been levied on, and which at the time of the petition was in the possession of an assignee of the debtor's creditors. *Id.*, Justice Blackmun held that *Phelps*, did not control to the

facts in *Whiting Pools*, on two grounds: (1) The new Bankruptcy Code abolished the distinction between summary and pecuniary jurisdiction, thus expanding the jurisdiction of the bankruptcy courts beyond the possession limitations; and, (2) *Phelps*, was a liquidation situation, and is inapplicable to reorganization proceedings such as in *Whiting Pools*. *Id.*

The Court in *Whiting Pools*, concluded that the reorganization estate includes property of the debtor that has been seized by a creditor prior to the petition for reorganization. *Id.*, 462 U.S. at 207–09, 103 S.Ct. at 2315. While acknowledging that by virtue of § 103(a), § 542(a) also governs turnovers in liquidation and individual adjustment proceedings under Chapters 7 and 13, the Court in *Whiting Pools*, stressed that it was expressing no view on the issue of whether § 542(a) has the same broad effect in liquidation or debt adjustment proceedings. *Id.* at n. 17.[11]

The Court in *Whiting Pools*, stated:

The Service is bound by § 542(a) to the same extent as any other secured creditor. The Bankruptcy Code expressly states that the term "entity," used in § 542(a), includes a governmental unit. § 101(14). *See* Tr. of Oral Arg. 16. Moreover, Congress carefully considered the effect of the new Bankruptcy Code on tax collection, see generally S.Rep. No. 95–1106 (1978) (report of Senate Finance Committee), and decided to provide protection to tax collectors, such as the IRS, through grants of enhanced priorities for unsecured tax claims, § 507(a)(6) [now § 507(a)(8) ], and by the nondischarge of tax liabilities, § 523(a)(1). S.Rep. No. 95–989, pp. 14–15 (1978). Tax collectors also enjoy the generally applicable right under § 363(e) to adequate protection for property subject to their liens. Nothing in the Bankruptcy Code or its legislative history indicates

---

**11.** Although footnote 17, *Whiting Pools* did not decide if § 542(a) was applicable to a case under Chapter 7 or Chapter 13, subsequent cases have held that § 542 and § 363 are applicable to all chapters. *See In re Gerwer*, 898 F.2d 730, 734 (9th Cir.1990) (although noting Collier's contrary view, holding Congress intended uniform reach of turnover power, it was included in Chapter 5 of the Bankruptcy Code); *In re Dunlap*, 143 B.R. 859, 864, 865 (Bankr.M.D.Tenn.1992) (Section 542 permits Chapter 13 debtor to recover pledged collateral—turnover refused as debtor unable to adequately protect secured party).

that Congress intended a special exception for the tax collector in the form of an exclusion from the estate of property seized to satisfy a tax lien.

## B

Of course, if a tax levy or seizure transfers to the IRS ownership of the property seized, § 542(a) may not apply. The enforcement provisions of the Internal Revenue Code of 1954, 26 U.S.C. §§ 6321–6326 (1976 ed. and Supp. V), do grant to the Service powers to enforce its tax liens that are greater than those possessed by private secured creditors under state law. *See United States v. Rodgers,* 461 U.S. 677, 682–84, 103 S.Ct. 2132, 2137, 76 L.Ed.2d 236 (1983); *id.,* at 711–13, 718 n. 7, 103 S.Ct. at 2152, 2155 n. 7 (dissenting opinion); *United States v. Bess,* 357 U.S. 51, 56–57, 78 S.Ct. 1054, 1057–1058, 2 L.Ed.2d 1135 (1958). But those provisions do not transfer ownership of the property to the IRS.

The Service's interest in seized property is its lien on that property. The Internal Revenue Code's levy and seizure provisions, 26 U.S.C. §§ 6331 and 6332, are special procedural devices available to the IRS to protect and satisfy its liens, *United States v. Sullivan,* 333 F.2d 100, 116 (C.A.3 1964), and are analogous to the remedies available to private secured creditors. *See* Uniform Commercial Code § 9–503, 3A U.L.A. 211–212 (1981); n. 14, *supra.* They are provisional remedies that do not determine the Service's rights to the seized property, but merely bring the property into the Service's legal custody. *See* 4 B. Bittker, *Federal Taxation of Income, Estates and Gifts* ¶ 111.5.5, p. 111–108 (1981). *See generally,* Plumb, *Federal Tax Collection and Lien Problems,* pt. 1, 13 Tax L.Rev. 247, 272 (1958). At no point does the Service's Interest in the property exceed the value of the lien. *United States v. Rodgers,* 461 U.S. at 690–91, 103 S.Ct. at 2141; *Id.,* at 723–25, 103 S.Ct. at 2158 (dissenting opinion); *see United States v. Sullivan,* 333 F.2d at 116 ("the Commissioner acts pursuant to the collection process in the capacity of lienor as distinguished from owner"). The IRS is obligated to return to the debtor any surplus from a sale. 26 U.S.C. § 6342(b). Ownership of the property is transferred only when the property is sold to a bona fide purchaser at a tax sale. *See Bennett v. Hunter,* 9 Wall. 326, 336, 19 L.Ed. 672 (1870); 26 U.S.C. § 6339(a)(2); Plumb, 13 Tax L.Rev., at 274–275. In fact, the tax sale provision itself refers to the debtor as the owner of the property after the seizure but prior to the sale. Until such a sale takes place, the property remains the debtor's and thus is subject to the turnover requirement of § 542(a).

## IV

When property seized prior to the filing of a petition is drawn into the Chapter 11 reorganization estate, the Service's tax lien is not dissolved; nor is its status as a secured creditor destroyed. The IRS, under § 363(e), remains entitled to adequate protection for its interests, to other rights enjoyed by secured creditors, and to the specific privileges accorded tax collectors. Section 542(a) simply requires the Service to seek protection of its interest according to the congressionally established bankruptcy procedures, rather than by withholding the seized property from the debtor's efforts to reorganize.

*Id.,* 462 U.S. at 207–12, 103 S.Ct. at 2315–17. (Footnote omitted).

The Supreme Court emphasized that the provision of 26 U.S.C. §§ 6321–6326 relating to tax liens and their enforcement do not transfer ownership of property to the IRS, even though the Supreme Court in *dictum* in *Phelps,* suggested the contrary wherein it stated: "The levy ... gave the United States full legal right to the $38,000.00 levied upon as against the petitioner receiver." *Id.,* 462 U.S. at 210, n. 18, 103 S.Ct. at 2316, n. 18 (*quoting, Phelps,* 421 U.S. at 337, 95 S.Ct. at 1732). The *Whiting Pools,* court observed that this sentence in *Phelps,* was merely a restatement of the proposition that the Levy gave the service a sufficient possessory interest to avoid the bankruptcy court's summary jurisdiction, and that this proposition is now irrelevant because of the expanded jurisdic-

tion of the bankruptcy court under the Bankruptcy Code. *Id.* The *Whiting Pools* court also distinguished the facts in, *Phelps,* where it held that "The prebankruptcy levy displaced any title of [the debtor], and is therefore inapplicable", 421 U.S. at 337, n. 8, 95 S.Ct. at 1733, n. 8, because in *Phelps,* the initial conveyance of the property by the debtor to the assignee was said to have extinguished the debtor's claim, and thus this statement was perhaps unnecessary to the court's decision. *Id.*

A majority of the Courts subsequent to *Whiting Pools* have held that a prepetition Notice of Levy by the IRS of a debtor's bank account is analogous to a prepetition repossession of tangible property, and that the bank account remains property of the debtor's estate subject to turnover. *See United States v. Challenge Air Int'l, Inc. (In re Challenge Air Int'l. Inc.),* 952 F.2d 384, 387 (11th Cir.1992); *In re Giaimo,* 194 B.R. 210, 211–14 (E.D.Mo.1996); *In re Hunter,* 201 B.R. 959, 960 (Bankr.E.D.Ark.1996) (where IRS levies on cash prepetition, but is not entitled to cash until after Petition, cash is property of the estate); *Federal Kemper Life Assurance Co. v. Wolensky's Ltd. Partnership (In re Wolensky's Ltd. Partnership),* 163 B.R. 629, 635 (Bankr.D.D.C.1994); *In re National Ctr. for Employment of Disabled,* 157 B.R. 291, 294 (Bankr.W.D.Tex.1993); *Metro Press, Inc. v. United States (In re Metro Press, Inc.),* 139 B.R. 763, 764 (Bankr. D.Mass.); *Flynn's Speedy Printing, Inc. v. Southtrust Bank (In re Flynn's Speedy Printing, Inc.),* 136 B.R. 299 (Bankr. M.D.Fla.1992); *Kirk v. United States (In re Kirk),* 100 B.R. 85, 90 (Bankr.M.D.Fla.1989) (but holding open the possibility that *Phelps,* is good law in a Chapter 7 proceeding); *In re AIC Indus., Inc.,* 83 B.R. 774 (Bankr.D.Colo. 1988); *In re Cleveland Graphic Reproduction, Inc.,* 78 B.R. 819, 820, 821–24 (Bankr. N.D.Ohio 1987); *In re All–Way Serv., Inc.,* 73 B.R. 556, 562 (Bankr.E.D.Wis.1987); *Rouse v. United States (In re Suppliers, Inc.),* 41 B.R. 520 (Bankr.E.D.Ky.1984); *Mills v. United States (In re Mills),* 37 B.R. 832, 834 (Bankr.E.D.Tenn.1984); *In re Davis,* 35 B.R. 795, 796–99 (Bankr. W.D.Wash.1983); *Dunne Trucking Co. v. United States (In re Dunne Trucking Co.),* 32 B.R. 182, 191 (Bankr.D.Iowa 1983); *Health Am. of Fla., Inc. v. Blue Cross–Blue Shield of Fla., Inc. (In re Health Am. of Fla., Inc.),* 22 B.R. 268 (Bankr.M.D.Fla.1982); *Bristol Convalescent Home, Inc. v. IRS (In re Bristol Convalescent Home, Inc.),* 12 B.R. 448, 451 (Bankr.D.Conn.1981).

A minority of cases hold that a Notice of Levy by the IRS is enough to terminate a debtor's ownership in a bank account, because the account consists only of the right to payment, and post-levy, the IRS is the only entity who can enforce that right. *See e.g., In re Ruggeri Electrical Contracting Inc.,* 185 B.R. 750, 752–53 (Bankr.E.D.Mich.1995); *In re Abercrombie,* 156 B.R. 782, 783–85 (Bankr.N.D.Tex.1993); *Brown v. Evanston Bank (In re Brown),* 126 B.R. 767, 771–77 (N.D.Ill.1991); *Altman v. Commissioner of IRS,* 83 B.R. 35, 38–39 (D.Haw.1988); *DiFlorio v. United States,* 30 B.R. 815, 816–18 (N.D.N.Y.1983); *In re Smiley,* 189 B.R. 338, 340–41 (Bankr.E.D.Pa.1995); *Rose v. Commercial Nat'l Bank (In re Rose),* 112 B.R. 12, 14–15 (Bankr.E.D.Tex.1989); *In re Kirk,* 100 B.R. 85, 86–91 (Bankr.M.D.Fla.1989); *Gerling v. United States (In re D'Aiuto),* 48 B.R. 451, 452–54 (Bankr.N.D.N.Y.1985) (escrow proceeds); *In re Debmar Corp.,* 21 B.R. 858, 860–61 (Bankr.S.D.Fla.1982) (Also holding that prepetition levy by IRS on debts due debtor not paid prepetition did not divest debtor of ownership and thus, accounts receivable and bank accounts were property of estate per § 541, subject to turnover per § 542, subject to trustee providing adequate protection and complying with the safeguards provision for cash collateral found in § 363(c)(2)).

The Court concludes that the position taken by the majority of the Courts is the proper one. As the Court in *In re Flynn's Speedy Printing,* 136 B.R. 299 (Bankr. M.D.Fla.1992) observed:

[t]he Internal Revenue Code itself and the Treasury Regulations promulgated thereunder provide further support for the proposition that cash levied upon prepetition does, indeed, become property of the debtor's estate upon the filing of a petition for relief under the Bankruptcy Code.

Section 6332(c) of the Internal Revenue Code of 1986 (26 U.S.C.) provides:

Any bank ... shall surrender ... any deposits (including interest thereon) in such bank only after 21 days after service of levy.

The proposed Treasury Regulations under this section provides:

To the extent that interest is accrued on the deposits and surrendered to the district director at the end of the [21–day] holding period, such interest is considered to be paid to the bank's customer and must be reported by the bank to the Internal Revenue Service as interest paid to the bank's depositor.

Prop. Treas. Reg. § 301.6332–3(c)(2), 56 Fed.Reg. 19963 (1991). It is utterly inconsistent for the IRS to contend, as it does here, that serving a notice of levy on a bank results in the immediate transfer of ownership of the funds on deposit from Debtor to the IRS while at the same time requiring Debtor to report interest accruing on the funds as income pursuant to the proposed Treasury Regulations. At a minimum, Debtor has retained the benefits and burdens of ownership in the funds in the demand account at Southtrust. Thus the funds levied upon by the IRS constitute property of Debtor's bankruptcy estate and are subject to turnover. *See also, West Aire, Inc. v. United States (In re West Aire)*, 131 B.R. 871 (Bankr.D.Nev. 1991).

*Id.*, 136 B.R. at 301. And as noted by the Court in *In re Giaimo*, 194 B.R. 210 (E.D.Mo.1996):

In 1990, Congress amended the surrender provision of the IRC's levy procedures to include a "special rule for banks." This provision reads:

Any bank (as defined in section 408(n)) shall surrender (subject to an attachment or execution under judicial process) any deposits (including interest thereon) in such bank only after 21 days after service of levy.

26 U.S.C. § 6332(c).

The regulations pertaining to this provision indicate that the depositor/taxpayer

has certain rights during the 21 day holding period. First, interest on the money in the bank account that accrues during the holding period, while surrendered to the IRS, "is treated as a payment to the bank's customer." 26 C.F.R. § 301.6332–3(c)(2) (1995). It would be difficult to conclude that ownership is completely divested from the taxpayer when interest accrued during the holding period is treated as income to the taxpayer. *See In re National Center for the Employment of the Disabled,* 157 B.R. 291, 296 n. 10 (Bankr.W.D.Tex.1993); *Matter of Flynn's Speedy Printing, Inc.,* 136 B.R. 299, 301 (Bankr.M.D.Fla.1992). Second, the regulations provide the taxpayer with the right to correct errors regarding the levied upon account during the holding period:

If a depositor believes that there is an error with respect to the levied upon account which the depositor wishes to have corrected, the depositor shall notify the district director ... to enable the district director to conduct an expeditious review of the alleged error.

26 C.F.R. § 301.6332–3(d)(1) (1995). For example, suppose the taxpayer paid the amount levied from a source other than the levied bank account to the IRS prior to the levy but the IRS had not received the money before the levy. As one bankruptcy court noted, "Would the IRS then be permitted to collect from the account debtor anyway, compelling the taxpayer to apply for a refund, or is the IRS compelled to release its levy upon payment? According to counsel for the Service at the hearing, the IRS would release the levy." *National Center,* 157 B.R. at 295–96. Presumably, the 21 day holding period provides an opportunity for the taxpayer to clarify matters in situations such as the one above before the bank actually pays the money to the IRS.

In addition, the conclusion that the taxpayer retains an interest in bank account funds during the holding period is consistent with the court's reasoning in *[In re] Professional Services [Technical Services, Inc. v. I.R.S.,* 71 B.R. 946 (1987)]: "An IRS levy is completed as to cash or a cash equivalent when the procedures found in

§ 6331 and § 6332 of Title 26 are performed." *Professional Services,* 71 B.R. at 950. Section 6331 of the IRC governs levy; § 6332 governs surrender. At the time the *Professional Services* decision was issued, § 6332 required surrender to the IRS upon demand from all persons in possession, including banks. In other words, surrender technically occurred simultaneously with the levy in that the IRS had an immediate right to possession, even though the banks did not always pay the IRS at the exact time the notice of levy was issued. Since that decision, however, congress has provided that banks shall not surrender funds in a bank account for 21 days. 26 U.S.C. § 6332(c). Therefore, under the current IRC, the levy procedures in § 6331 and § 6332 are not complete until the bank surrenders the money 21 days after service of the levy. Further, although the court in *Professional Services* considered surrender by the bank a mere "ministerial act" that is not an essential step to completion of the levy, that conclusion is doubtful in light of the new 21 day holding period during which the taxpayer has the express right to challenge the levy.

The conclusion in *Whiting Pools* that ownership of tangible property is transferred to the IRS at the point of the tax sale is also instructive in light of language contained in the IRC. *Whiting Pools,* 462 U.S. at 211, 103 S.Ct. at 2317. The Court's holding with respect to tangible property is consistent with § 6342 of the IRC, which governs application of the proceeds of a levy. 26 U.S.C. § 6342. Section 6342 instructs the IRS on how to apply "money realized" from the levy. The threshold provision of § 6342 reads: "Any money realized by proceedings under this subchapter *(whether by seizure, by surrender under section 6332 . . . or by sale of seized property )* . . ." *Id.* § 6342(a) (emphasis added). This section, therefore, clearly does not contemplate "money realized" by the levy itself. Rather there must be seizure, surrender, or sale. In the case of tangible property, money is generally realized at the sale, as noted in *Whiting Pools;* with respect to bank accounts, the money

is realized by the IRS when surrendered 21 days after the levy.
*Id.,* 194 B.R. at 213–14.

One commentator's analysis as to the legal effect of a Notice of Levy on a Debtor's bank account is also persuasive. *See* Coleman, *Pre–Petition IRS Levies on "Cash Equivalents": Are they recoverable by the Estate even absent a present right to collect.* 100 Comm. L.J. 471. Coleman observes:

Serving a Notice of Levy on an account debtor or bank (the "leviee") imposes a duty on the leviee to pay to the IRS any money it owes to the debtor. The leviee remains subject to that obligation until the demand is either honored or the levy is released. The leviee, however, also remains obligated on its contractual duty to pay the *debtor.* Section 6332(e) provides that honoring the IRS's demand extinguishes *both* the leviee's liability to the IRS and its liability to the debtor. Quite clearly then, the leviee is subject to two obligations prior to payment, its contractual obligation to pay the debtor, and its obligation pursuant to Section 6332 to pay the IRS. If the leviee had only the obligation to the IRS, there would be no need to provide for the discharge of the leviee's obligation to the debtor/taxpayer.

Several of the minority view cases reason that by imposing liability on the leviee (via serving the Notice of Levy), the leviee's contractual obligation to pay the debtor is extinguished. They conclude the obligation is extinguished because they are unable to discern any legal right exercisable by the debtor with respect to the right to payment. The problem with this conclusion—apart from ignoring the fact that Section 6332(e) provides that the obligation is discharged only at a later time, namely payment to the IRS—is that it creates certain logical difficulties in other parts of the IRC scheme for the collection of delinquent taxes. One such instance is when a levy is subsequently released without payment by the leviee—Levies may be released under several circumstances, [*citing,* 26 U.S.C. § 6343(a) ].

\* \* \* \* \* \*

The Supreme Court has given us several descriptions of how a levy impacts upon

the respective rights and duties between the debtor/taxpayer, the IRS and the leviee. According to *Whiting Pools [United States v. Whiting Pools, Inc.,* 462 U.S. 198, 210–11, 103 S.Ct. 2309, 2316, 76 L.Ed.2d 515 (1983) ], a levy on tangible assets is a

> provisional remedy that do[es] not determine the Service's right to the seized property, but merely bring[s] the property into the Services' legal custody ... [and which] do[es] not transfer ownership to the IRS.

According to *Phelps [v. United States,* 421 U.S. 330, 334, 95 S.Ct. 1728, 1731, 44 L.Ed.2d 201 (1975) ] (as amplified *in National Bank of Commerce [United States v. National Bank of Commerce,* 472 U.S. 713, 720, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565 (1985) ] (Levy gives IRS constructive possession of the funds in bank account)) serving a Notice of Levy on a bank creates a custodial relationship between the [person holding the property] and the United States and thereby reduce[s] the [funds] to the United States' constructive possession. *National Bank of Commerce,* elaborated on the levy's legal effect by saying

> In contrast to the lien-foreclosure suit, the levy does not determine whether the government's rights to the seized property are superior to those other claimants; it, however, does protect the Government against diversion or loss while such claims are being resolved.

Yet another case involving a levy on a bank account said that service of the Notice of Levy effectively froze the money in the account ... and the contents of the safe deposit boxes. [*Commissioner v. Shapiro,* 424 U.S. 614, 619, 96 S.Ct. 1062, 1067, 47 L.Ed.2d 278 (1976) ].

As shown by the quoted text, the Supreme Court repeatedly states that a levy does not determine the rights of the taxpayer, the IRS, or third parties in the levied-upon property. It has so stated in situations involving both tangible (as in *Whiting Pools*) and intangible (as in *National Bank of Commerce*) property. The Supreme Court's consistent use of the term "determine" in describing what the levy does not do suggests that the term is being used in its generally accepted legal

sense. Black's Law dictionary defines "determination" of rights (in the context of competing legal claims) to mean the termination or extinguishment of a party's rights. Thus, there can be no question that the act of seizure (by serving a Notice of Levy) does not extinguish a debtor's right to enforce a right to payment. Although the levy does not extinguish a debtor's rights in levied-upon property, there can also be no question that the levy puts the government in custody of or control over the property. As indicated in the quoted text from *National Bank of Commerce,* Congress' intent in authorizing the IRS to levy upon and take control of property was to ensure that the property is not diverted or dissipated. If that is the goal, then a debtor cannot retain an unfettered right to dispose of the property. Clearly, enforcement or assignment of the right to payment by the debtor would be inconsistent with the purpose of the levy. Thus, there must be some diminution of the debtor's legal controls over the right to payment.

*Id.,* 100 Comm. L.J. at 485–489.

■ The Court is persuaded by the reasoning of the majority of the Courts on this threshold issue, and concludes that the fact that the IRS served its Notice of Levy on the Bank Prepetition did not, standing alone, transfer ownership of the Bank account to the IRS, and thus, the monies remitted by the Bank to the IRS Postpetition remain property of the Debtor's Estate pursuant to § 541(a). However, the Court also concludes that at the time the Notice of Levy was served on the Bank the Notice effectively put a freeze on the account, and placed the account in the constructive possession of the IRS as of the date the Notice was served on the Bank, or prior to the Petition date.

### H

***Whether the Refusal of the IRS to Turn over the Funds distributed to the IRS by the Bank Postpetition from the Debtor's Bank Account pursuant to a Prepetition Notice of Levy constitutes a violation of the § 362 automatic stay?***

Section 362(a) provides, in part, as follows:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

\* \* \* \* \* \*

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

The Trustee apparently takes the position that § 542(a) accords him the absolute right to the turnover by a secured party of any estate property that has been "repossessed" by a secured party prepetition, (or as in this case is in the constructive possession of the IRS pursuant to a prepetition Notice of Levy to the Bank), that is still in the secured creditor's possession or control postpetition, and that the failure of a secured creditor to adhere to his turnover demand under any set of circumstances constitutes a violation of the § 362(a) automatic stay. The Trustee would apparently have the Court adopt the reasoning of the court in *In re Sharon*, 200 B.R. 181, 187–88 (Bankr.S.D.Ohio 1996) (Secured creditor that lawfully seized Chapter 13 debtor's automobile prepetition violated automat-

ic stay pursuant to § 362(a)(3) in wrongfully exercising over property of the estate by refusing to turn over vehicle to debtor, absent court determination of adequate protection) (citing *In re Knaus*, 889 F.2d 773 (8th Cir.1989); *Carr v. Security Savings & Loan Assoc.*, 130 B.R. 434 (D.N.J.1991); *In re Dungey*, 99 B.R. 814 (Bankr.S.D.Ohio 1989)).

The Court respectfully disagrees with the conclusion reached by the court in *Sharon*, and concludes that the analysis of whether an act of a creditor violates § 362(a)(3) in refusing to relinquish possession of estate property postpetition that was properly repossessed prepetition requires a close reading of the purposes of § 542(a), § 362(a)(3), § 363(e), and § 363(*o*)(1), and their interrelationship, as made by the court in *In re Young*, 193 B.R. 620 (Bankr.D.Col.1996). The court in *Young*, stated as follows:

As suggested, the 1984 language forbidding an act to exercise control over property has been interpreted by some courts to mean that any postpetition retention of the debtor's property violates the automatic stay and is, indeed, sanctionable. *See In re Knaus*, 889 F.2d 773 (8th Cir.1989) (duty to return property arises upon the filing of petition); *Carr v. Security Savings & Loan Association*, 130 B.R. 434 (D.N.J.1991) (creditor sanctioned for not turning over property despite alleged bad faith of petition); *In re Coats*, 168 B.R. 159 (Bankr.S.D.Tex.1993); *General Motors Acceptance Corp. v. Ryan*, 183 B.R. 288 (M.D.Fla.1995).

\* \* \* \* \* \*

In contrast, other courts have rejected the *Knaus*, approach, reasoning that § 362(a)(3) freezes the status quo on the filing of the petition rather than mandates affirmative action by the creditor in possession of property seized prepetition to return it immediately. *In re Richardson*, 135 B.R. 256 (Bankr.E.D.Tex.1992); *cf. In re Deiss*, 166 B.R. 92 (Bankr.S.D.Tex.1994) (creditor entitled to adequate protection before turnover); *In re Najafi*, 154 B.R. 185, 194–95 (Bankr.E.D.Pa.1993) (same). *See also In re Briggs*, 143 B.R. 438, 448 n.

15 (Bankr.E.D.Mich.1992) (dicta rejecting *Knaus* ).

\* \* \* \* \* \*

In espousing the status quo approach, the court in *Richardson,* distinguished the contrary authority in the Eighth Circuit's decision in *Knaus* on the grounds that *Knaus* failed to address the creditor's entitlement to proof of adequate protection before the seized property is turned over. *See Id.* at 259. *Richardson,* distinguishes *Carr* on similar grounds—the creditor in that case had demanded and received proof of insurance (and thus adequate protection) from the debtor and yet still refused to turn over the property. *See id. Richardson,* and the other courts supporting the status quo approach argue that where there is *no* proof of adequate protection, "prior to the turnover of property, the rights of a creditor must be adequately protected." *Id.*

## IV

This court rejects the *Knaus* court's (and its progeny's) interpretation of the amendment to § 362(a)(3), which requires immediate turnover by the secured creditor possessing property rightfully seized prepetition. At best, as will be discussed below, the meaning of the Code's restriction of an act "to exercise control" is ambiguous, and the *Knaus* court's analysis is too great a departure from traditional bankruptcy practice for this court to adopt that analysis without some legislative history endorsing such a dramatic change.

\* \* \* \* \* \*

That § 362(a)(3) is susceptible of a plausible interpretation contrary to that in *Knaus* is readily demonstrated. While each of the words "exercise" and "control" is clearly defined by Webster's the significance of the phrase "to exercise control" in the Code is, at best, ambiguous, as evidenced by the split of authority cited above. And, absent any legislative history, Congress's (sic) intent in amending the Code to restrict such an act is equally undivinable. The turnover provision of § 542(a) applies to property in the "posses-

sion, custody or control" of a creditor. Similarly, § 362(a)(3) restricts both an act to "obtain possession" of the property and an act to "exercise control" over the property. Courts must give meaning to all words in the statute. *Negonsott v. Samuels,* 507 U.S. 99, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993). Accordingly, Congress must have though that "control" differs from "possession", or "custody".

\* \* \* \* \* \*

In contrast to the act of passively retaining possession, the prohibited act of exercising control implies a more affirmative act by the creditor. As the Webster's definition indicates, the word exercise connotes the positive acts of bringing into play, making effective in action, bringing to bear, exerting. One commentator has commented that had Congress intended the amendment to § 362(a)(3) to require immediate turnover, "more passive language such as 'retain control' would be found in the revision to Section 362(a)(3) of the Code." *See* John C. Chobot, *Some Bankruptcy Stay Metes and Bounds,* 99 Com.L.I. 301, 309 (1994) (emphasis added). By the same logic, if Congress intended to prohibit creditors from holding property seized prepetition, it also could have barred an act to "retain possession." Read in this context, the prohibition against an act to exercise control does not reach the passive act of continuing to possess property.

\* \* \* \* \* \*

This court finds the *Knaus* court's resolution of this ambiguity unsatisfactory because that court's interpretation leads to an inconsistent and illogical statutory scheme and would result in a dramatic shift in pre-Code and pre-amendment practice.

\* \* \* \* \* \*

The effect of *Knaus* court's interpretation of § 362(a)(3) is completely to prevent creditors from retaining possession of seized property sought by the trustee. Procedurally, under the *Knaus* approach, the only appropriate nonsanctionable course of action for the secured creditor in

possession of property of the debtor seized prepetition is to turn over the property to the estate immediately and thus waive the right to assert its defenses to turnover under § 542(a) until *after the property has been turned over to the trustee* pursuant to a motion for relief from stay under § 362(d) or a motion for adequate protection under § 363(e). *See In re Ryan,* 183 B.R. at 289. This proves too much.

Section 542(a) itself expressly recognizes one circumstance in which turnover in not required, namely, when the "property is of inconsequential value or benefit to the estate." Under *Knaus,* that would not be a valid defense to § 362(a)(3) because § 362(a)(3) contains no exception for property of inconsequential value or benefit to the estate. Congress would not logically have intended that the estate expressly not be entitled to turnover under § 542(a) in such a case but for the creditor simultaneously to be required by § 362(a)(3) to turn over the collateral.

More importantly, § 542(a) also limits turnover to property that can be used under § 363. Under § 363(e) the creditor can obtain an order prohibiting a proposed use of the property unless the estate provides adequate protection. This constitutes a significant defense to the grant of a turnover order under § 542(a). The defense would be abrogated by an interpretation of § 362(a)(3) requiring turnover without permitting invocation of the defense.

Such an approach is contrary to the logical interaction of §§ 363(e) and 542(a). The burden is on the trustee, when the issue is raised, to prove adequate protection. 11 U.S.C. § 363(o)(1). Logically, therefore, the creditor should be entitled to hold onto the property during the pendency of the § 542 action until the adequate protection question is resolved. The obvious rationale implicit in permitting the secured creditor to retain possession of the seized property while opposing may suffer the very harm that adequate protection is designed to avoid if the property is turned over to the trustee before the trustee proves that the creditor is being given the adequate protection to which it is entitled.

Finally, § 363(c)(2) provides that the trustee may not use cash collateral without the creditor's consent or a court order. Section 542(a) does not require turnover of such collateral in a creditor's possession when there has been no consent or court order. But under *Knaus,* the creditor would required to relinquish possession.

\* \* \* \* \* \*

In *Whiting Pools,* the Court noted that "[u]nder Chapter X, the reorganization chapter of the Bankruptcy Act of 1878 ..., the bankruptcy court could order the turnover of collateral in the hands of a secured creditor. *Reconstruction Finance Corp. v. Kaplan,* 185 F.2d 791 (1st Cir.1950)." 462 U.S. at 208, 103 S.Ct. at 2315 (other citations omitted). The case cited by the Court, *Kaplan,* confirms that pre-Code such a turnover required an order of the court and required some proof of adequate protection by the debtor or trustee before such a turnover was ordered. 1 85 F.2d at 797–98.

\* \* \* \* \* \*

Furthermore, as can also be seen from the *Whiting Pools* decision, under the Code, prior to the § 362(a)(3) amendment, the common practice of conditioning turnover orders on proof of adequate protection continued. Courts uniformly supported the practice that "[a] secured creditor may insist upon adequate protection *as a condition precedent,* to the turnover of property since the property may not be used, sold or leased under section 363 without it." *In re R. Purbeck & Assoc., Ltd.,* 12 B.R. 406, 408 (Bankr. D.Conn.1981) (emphasis added); *accord In re Williams,* 44 B.R. 422, 425 (Bankr. N.D.Miss.1984); *In re Loof,* 41 B.R. 855, 856 (Bankr.E.D.Pa.1984); *In re Radden,* 35 B.R. 821, 826 (Bankr.E.D.Va.1983); *In re Day Resource Development Co., Inc.,* 21 B.R. 176, 177 (Bankr.D.Idaho 1982); *In re Bridges,* 19 B.R. 847 (Bankr.D.Me. 1982); *In re Williams,* 6 B.R. 789, 792 (Bankr.E.D.Mich.1980); *In re Fairway Records, Inc.,* 6 B.R. 162, 164 (Bankr. E.D.N.Y.1980); *In re Troy Ind. Catering Serv.,* 2 B.R. 521, 526 (Bankr.E.D.Mich. 1980).

Hence, were this court to interpret the ambiguous amendment to § 362(a)(3) to require immediate turnover, it would represent a dramatic shift in both pre-Code and pre-amendment practice, all of which without one word of legislative history. It is difficult for this court to believe that Congress intended such a radical change, and the court declines to adopt it.

That the exercise control language in § 362(a)(3) requires only that the secured creditor maintain the status quo is also supported by a decision in this circuit in *United States v. Inslaw,* 932 F.2d 1467 (D.C.Cir.1991), *cert. denied,* 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992). In *Inslaw,* the debtor alleged that the Justice Department's continued use and dissemination of the debtor's trade secrets in computer software that were the subject of a title dispute constituted an act to "exercise control over the property of the estate" prohibited by § 362(a)(3). In reversing this court's decision that the Justice Department had willfully violated the automatic stay, the District of Columbia Court of Appeals discussed the inherent limitations and boundaries of the automatic stay under § 362(a).

\* \* \* \* \* \*

The court of appeals further noted, however, that such a broad reading of § 362(a) would also be contrary to Congress's (sic) intent.

Even apart from constitutional concerns, [the debtor's] view of § 362(a) would take it well beyond Congress's [sic] purpose. The object of the automatic stay provision is essentially to solve a collective action problem—to make sure that creditors do not destroy the bankruptcy estate in their scramble for relief. Fulfillment of that purpose cannot require that every party who acts in resistance to the debtor's view of its rights violates § 362(a) if found in error by the bankruptcy court.... Since willful violations of the stay expose the offending party to liability for compensatory damages, costs, attorney's fees, and, in some circumstances, punitive damages, *see* 11 U.S.C. § 362(h) (1988), it is

difficult to believe that Congress intended a violation whenever someone already in possession of property mistakenly refuses to capitulate to a bankrupt's assertion of rights in that property.

*Id.,* at 1473 (citation omitted).

*Id.,* 193 B.R. at 623–29 (footnotes omitted) (emphasis supplied).

The issue of the scope of § 362(a)(3) also has been analyzed in some detail in two recent law review articles. *See* Carlson, *Turnover of Collateral in Bankruptcy: Must a Secured Party–In–Possession Volunteer?* 6 J. of Bankr.Law 483; Practice 483; Chobot, *Some Bankruptcy Stay Metes and Bounds,* 99 Comm. L.J. 301.

Chobot states as follows:

There is a significant body of case law holding that a creditor repossessing a debtor's property postpetition, without knowledge of a bankruptcy filing, is required to restore the status quo as of the bankruptcy filing and return the repossessed property within a reasonable period of time. *Knaus,* [889 F.2d 773 (8th Cir. 1989) ] has nothing to do with restoring the status quo as of the petition date, because, in *Knaus,* the secured creditor was in possession of the property on the petition date.

In *Carr v. Security Savings and Loan Association,* [130 B.R. 434 (D.N.J.1991) ] the debtor filed a second Chapter 13 proceeding after a creditor had obtained relief from the stay in the debtor's first Chapter 13 proceeding and had repossessed an automobile. The New Jersey district court held that Section 362(a)(3) had been violated by the creditor's failure to turn over the automobile after the second Chapter 13 filing and ordered the creditor to pay compensatory damages (cost of a replacement rental car) plus attorney's fees, but gave the creditor a credit for the repossession costs it had incurred.

The expansive view of the automatic stay expressed in *Knaus* and *Carr* runs counter to the interplay of Bankruptcy Code provisions when a bankruptcy filing intervenes in time between a creditor's repossession and the disposition of the

property pursuant to the UCC, real estate foreclosure proceeding or other state law methods by which the creditor's lien or security interest is foreclosed.

Since the United States Supreme Court's 1983 decision in *United States v. Whiting Pools, Inc.*, secured creditors have been aware that a bankruptcy filing stays resale or other collateral disposition activities. However, before turning over property pursuant to Section 542(a) of the Bankruptcy Code, *Whiting Pools* recognizes that secured creditors have the right to demand adequate protection of their interests in the property pursuant to Sections 361 and 363(e) of the Code. The *Knaus* court ignores the secured creditor's right to "demand adequate protection as a condition precedent to turnover", [*citing*, 4 Collier on Bankruptcy, ¶ 545.02].

\*　　\*　　\*　　\*　　\*　　\*

A decision of the Circuit court of appeals for the District of Columbia may help clarify the problems created by the *Knaus* decision and stimulate further evaluation of Section 362(a)(3), *United States v. Inslaw*, [932 F.2d 1467 (D.C.Cir.1991), *cert. den.* 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992) ] involved a dispute between the Department of Justice and a Chapter 11 debtor/supplier of software enhancements. The debtor alleged that the Department violated the Section 362(a)(3) "exercise control over property of the estate" clause by the retention and further dissemination of enhanced software supplied by the debtor.

While distinguishable from the collateral repossession situation because actual title to the software was at issue, *Inslaw* is instructive in setting forth the inherent limitations and boundaries of the automatic bankruptcy stay. In addressing the Department's alleged willful violation of the bankruptcy stay, the Court explained that:

> Here the Bankruptcy court appears to have left the words of the statute in the dust. The automatic stay, as its name suggests, serves as a restraint only on acts to gain possession or control over property of the estate. Nowhere in its language is there a hint that it creates an affirmative duty

to remedy past acts of fraud or bias of harassment as soon as a debtor files a bankruptcy petition. The statutory language makes clear that the stay applies only to acts taken *after* the petition is filed.

*Inslaw* correctly interprets Section 362(a)(3) as requiring that there be "acts to gain possession or control over property of the estate ... taken *after* the petition is filed" for a stay violation to exist. The *Inslaw* approach is fully consistent with the wording of the clause added by Congress in 1984 which employs the term "*exercise control,*" indicating that some affirmative act by the creditor is required. Had Congress intended a *Knaus* result, more passive language such as "retain control" would be found in the revision to Section 362(a)(3) of the Code.

\*　　\*　　\*　　\*　　\*　　\*

Even if there is vagueness or ambiguity in the clause added by Congress in 1984, Section 362(a)(3) should not be construed to have radically expanded the automatic bankruptcy stay to impact prepetition creditor repossessions absent support in the legislative history. As explained by the United States Supreme Court in *Dewsnup v. Timm*, [502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992)], interpreting Section 506(d) of the Bankruptcy Code: "When Congress amends the bankruptcy laws, it does not write 'on a clean slate'.... Furthermore, the Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history."

One Texas bankruptcy court specifically rejects the rationale of *Knaus*. *In re Richardson*, [135 B.R. 256 (Bankr. E.D.Tex.1992) ] involved a creditor's prepetition repossession of an automobile. The debtor filed a Chapter 13 petition four days later and the debtor's attorney demanded turnover of the automobile. When the creditor failed to return the vehicle, the debtor brought a proceeding in

bankruptcy court for violation of the automatic stay.

The Court rejected *Knaus* and *Carr*, explaining:

In this Court's opinion, the Debtor and the cases [*Knaus* and *Carr*], supportive of her position have misread and misapplied Section 362(a)(3) of the Code. By statute, the filing of a petition for relief imposes a mandatory stay of any creditor's collection attempts. The effect of this stay is to freeze the status quo. To the extent that a creditor fails to desist in these collection attempts and attempts to exercise control over the property of the estate postpetition, such creditor can be sanctioned pursuant to Section 362(h). However, this provision for creditors who affirmatively act in violation of the stay postpetition can not be extrapolated to punish creditors who where legally seizing the property of the estate prepetition, failed to return this property immediately to the debtor postpetition. In maintaining the seized property in the status it enjoyed just before the filing of the debtor's petition, a creditor is merely complying with the spirit of the Section 362 freeze. As for the issue of the meaning of the phrase "exercise control over property of the estate" contained in Section 362(a)(3), this Court holds that any exercise of control, to be sanctionable, must occur postpetition and involve an affirmative act on the part of a creditor.

*Richardson*, is consistent with the requirement in *Inslaw* that the stay applies only to creditor acts taken after the bankruptcy petition is filed.

*Id.*, 99 Comm. L.J. at 307–10 (footnotes omitted) (emphasis supplied).

Carlson observed as follows:

Of the sweeping nature of the automatic stay, Justice Antonin Scalia has written: "It is an elementary rule of construction that 'the act cannot be held to destroy itself'". It may be presumed then, that exceptions to the automatic stay may be deduced from other parts of the Bankruptcy Code.

This article concerns itself with such an implied exception. The exception arises in favor of secured parties that have lawfully repossessed collateral prior to a bankruptcy petition. According to Section 362(a)(3), the automatic stay prohibits:

any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

Courts have read Section 363(a)(3) to mean that continued possession by a secured party constitutes "control" over property of the estate. According to these courts, this "control," no matter how passive, places the secured party in a contempt of court. Only divestment of possession purges a secured party of contempt.

The purpose of this article is to establish that because of an implied exception to Section 362(a)(3), the automatic stay does *not* imply a duty to surrender possession at the behest of a bankruptcy trustee. The reason is that the Bankruptcy Code, in Section 542(a), provides for a trustee's right to a turnover of such collateral. In response to the trustee's action, a secured party will have an opportunity to assert defenses that are described in and around Section 542(a). These defenses imply that a secured party need not surrender collateral in the absence of a court order. Rather, a secured party may hold collateral in anticipation of the trustee's action for a Section 542(a) turnover. The reading of the automatic stay being criticized in this article would obliterate these defenses.

In particular, it will be shown that the United States Supreme Court has already decided this question. In *Citizens Bank v. Strumpf*, [516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995)] Justice Antonin Scalia ruled that, when a bank "freezes" a deposit account, it has not violated the automatic stay. Freezing a deposit account is precisely analogous to holding repossessed collateral pending the turnover action. Therefore, *Strumpf*, stands for the proposition being urged in this article.

Thus, Section 362(a)(3) must be read in conjunction with Section 542(a). To guarantee a secured party continued access to

turnover defenses, Section 362(a)(3) must not be read to require the voluntary termination of a secured party's lawfully obtained possession of collateral.

\* \* \* \* \* \*

Whether Section 542(a) or Section 543 applies, defenses exist that a secured party might assert to resist the obligation to turn over collateral. The limitations to the trustee's right to a turnover suggest that a secured party-in-possession of collateral does not have to surrender that possession. These defenses, then, imply an exception to Section 362(a)(3), which otherwise bars "control" by the secured party over property of the bankruptcy estate.

To be distinguished, of course, are cases in which the repossession occurs *after* the bankruptcy petition. In such cases, the integrity of automatic stay requires the return of the repossessed collateral. In these circumstances, a secured party may not even assert the absence of adequate protection as a reason not to undo the wrong. Overt violations of the automatic stay must be corrected. But mere passivity—mere failure to surrender collateral repossessed before bankruptcy—should not be considered a violation of the stay at all.

Some courts insist that the secured party has a duty to tender repossessed collateral upon the debtor's demand and that failure to do so is itself a violation of the automatic stay. The authority for this proposition is Section 362(a)(3), which chastises "any act ... to exercise control over property of the estate," words added to the Bankruptcy Code in 1984 to broaden the scope of the stay. Mere continued possession is said to constitute the exercise of control, in violation of Section 362(a)(3). [*In re Sharon*, 200 B.R. 181 (Bankr. S.D.Ohio 1996) ].

The leading case to hold for an affirmative duty to turn over collateral—even though the trustee has not brought an action for turnover under Section 542(a)— is *Knaus v. Concordia, Lumber Co. (In re Knaus* ), [889 F.2d 773 (8th Cir.1989) ].

\* \* \* \* \* \*

It is submitted that the Supreme Court has already held that a secured party-in-possession of collateral has no obligation to volunteer a turnover in the absence of a court order. In *Citizens Bank v. Strumpf,* a bank put an "administrative freeze" on a checking account, hoping to preserve a set-off right. It then moved to lift the automatic stay. This freeze can be compared with holding repossessed collateral pending the trustee's turnover action against the repossessing secured party.

The bankruptcy court in *Strumpf,* had ruled the freeze to be in violation of the automatic stay. It cited Section 362(a)(7), barring postpetition setoffs. Later, the bankruptcy court lifted the automatic stay so that the bank could manifest the setoff, but by that time the debtor had written checks on the account, which the bank was obliged to honor. Hence, the bank lost its setoff right altogether.

Justice Antonin Scalia reversed, holding that the administrative freeze was not a setoff and hence not a violation of the automatic stay. One of his reasons was that, otherwise, the bank's defenses to a turnover under Section 542(b) (which applies to account debtors) would be destroyed:

> It would be an odd construction of § 362(a)(7) that required a creditor with a right of setoff to do immediately that which § 542(b) specifically excuses it from doing as a general matter: pay a claim to which a defense of setoff applies ... [I]t would ... eviscerate § 542(b)'s exception to the duty to pay debts. It is an elementary rule of construction that "the act cannot be held to destroy itself." [516 U.S. at 18–21, 116 S.Ct. at 289–90].

So far, this does not help us in our inquiry. In the above-quoted passage, Justice Scalia denies that the freeze is a setoff, and so Section 362(a)(7) is not violated.

But could the debtor have argued that the administrative freeze was an act of "control" over the deposit account? Justice Scalia denied the proposition, but then made the point that is asserted here—the defenses to Section 542 turnover imply an

exception to the automatic stay permitting continued "control" of collateral. Here is how Justice Scalia addressed the point that the administrative freeze might be an act of control under Section 362(a)(3):

> Finally, we are unpersuaded by respondent's additional contentions that the administrative hold violated § 362(a)(3) and § 362(a)(6). Under these Sections, a bankruptcy filing automatically stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." Respondent's reliance on these provisions rests on the false premise that petitioner's administrative hold took something from respondent, or exercised dominion over property that belonged to respondent. That view of things might be arguable if a bank account consisted of money belonging to the depositor and held by the bank. In fact, however, it consists of nothing more or less than a promise to pay was neither a taking of possession of respondent's property nor an exercising of control over it, but merely a refusal to perform its promise. In any event, we will not give §§ 362(a)(3) or (6) an interpretation that would proscribe what § 542(b)'s "exception" and § 553(a)'s general rule were plainly intended to permit: the temporary refusal of a creditor to pay a debt that is subject to setoff against a debt owed by the bankrupt. [516 U.S. at 21, 116 S.Ct. at 290].

In this passage, Justice Scalia suggests that debts owed to the debtor are distinguishable from tangible property held by the bank. This distinction in drawn because Scalia feared the effect of Section 362(a)(3)—with its breathtaking admonition against "control" over property of the estate.

Later, more will be said regarding this distinction between tangible and intangible property. For now, please note that Scalia makes this distinction but does not rely on it. The important point is that, immediately after hazarding this distinction, he excuses the Section 362(a)(3) violation in order to preserve the turnover defenses under Section 542.

Given that the administrative freeze of a bank account can plausibly be characterized as "control" over property of the debtor, Justice Scalia's reasoning shows that, in general, secured parties need not surrender collateral that they have already possessed. Rather, they can put an "administrative freeze" on the collateral and move to lift the automatic stay or wait for the debtor to bring a turnover action.

*Id.*, 6 J of Bankr.Law and Practice, at pp. 487–95 (footnotes omitted).

Based on the foregoing analysis, the Court concludes that the failure or refusal of the IRS to adhere to the Trustee's unqualified demand for the turnover of the proceeds of the Bank account does not necessarily constitute a violation of the § 362(a) automatic stay.

Obviously, the prepetition Notice of Levy by the IRS did not violate the § 362(a) automatic stay, and there is no requirement in the Code that a prepetition secured creditor must, postpetition, release its prepetition lien. However, the Trustee asserts that postpetition the IRS violated the automatic stay in two ways. First, once it had actual notice or knowledge of the Debtor's Petition, it should have notified the Bank to not turn the funds in the Debtor's bank account over to it pursuant to its prepetition Notice of Ley. Secondly, once the IRS received the funds it should have not retained possession thereof, but should have immediately adhered to the Trustee's letter of August 13, 1996 to the IRS demanding the turnover of those funds.

The Court perceives one possible basis to conclude that the two postpetition failure or refusals to act by the IRS (i.e. notify the Bank to not honor the prepetition Notice of Levy, and the failure or refusal of the IRS to turnover to the Trustee the proceeds of the Bank account after demanded to do so by the Trustee) could conceivably constitute a violation of the § 362(a) automatic stay. The relief requested by the Trustee might be

premised on § 362(a)(3), which provides that the Debtor's Petition operates as a stay of "an act to obtain possession of property of the estate or property of the estate, or to exercise control over property of the estate."

The facts are undisputed that the IRS was placed in constructive possession of the Bank account prepetition, when it issued the Notice of Levy to the Bank on April 30, 1996, and did not obtain postpetition possession of the proceeds of the Bank account by an affirmative or positive act on its part. It did nothing postpetition regarding the Notice of Levy. Based on the foregoing analysis the Court does not find that the failure or refusal of the IRS to notify the Bank postpetition that it should not honor the prepetition Notice of Levy constitutes a violation of § 362(a)(3), as the IRS had no such duty. The IRS only had a duty to not commit any affirmative, postpetition act that would disturb the *status quo* as of the Petition date. This it did not do. It merely issued its prepetition Notice of Levy pursuant to 26 U.S.C. § 6332(c), as supplemented by 26 C.F.R. § 301.6332–3, and the 21 day waiting period had already begun to run prior to the Petition date. The stay did not operate to stay the running of the 21 day period. The prepetition Notice of Levy was somewhat analogous to a prepetition repossession of tangible property as it placed the IRS in constructive possession of the Bank fund at that time. Thus, based upon the above analysis, there was no stay violation by the IRS in not volunteering postpetition to waive any of its rights under the prepetition Notice of Levy.[12]

12. Assuming *arguendo*, this did constitute a stay violation, it would be at most a technical violation of the stay, which would not warrant sanctions. The Bankruptcy Noticing Center on behalf of the Clerk served its Notice of the Debtor's Petition on the IRS on May 10, 1997, at its Regional Office in Cincinnati, Ohio. The Notice of Levy was issued by the IRS' Merrillville, Indiana Office.

Although the record does not reveal the date that the Cincinnati Office received the Notice, assuming it was received on May 11, 1996 (a Saturday), it would not have been acted upon by an IRS employee until May 13, 1996, or only 10 days before the Bank issued its check to the IRS

## I

*Whether the IRS must turn over to the Debtor's Chapter 7 Trustee the funds in the Debtor's Bank Account which were distributed by the Bank to the IRS postpetition pursuant to a prepetition tax levy without providing the IRS with Adequate Protection as to its Tax Lien in the Proceeds of the Debtor's Bank Account?*

The Supreme Court in *Whiting Pools* expressly rejected the assertion that the IRS should be treated differently than other secured creditors when it stated:

Although Congress might have safeguarded the interests of secured creditors outright by excluding from the estate any property subject to a secured interest, it chose instead to include such property in the estate and to provide secured creditors with "adequate protection" for their interests. § 363(e), quoted in n. 7, *supra*. At the secured creditor's insistence, the bankruptcy court must place such limits or conditions on the trustee's power to sell, use, or lease property as are necessary to protect the creditor. The creditor with a secured interest in property included in the estate must look to this provision for protection, rather than to the nonbankruptcy remedy of possession.

\* \* \* \* \* \*

When property seized prior to the filing of a petition is drawn into the Chapter 11 reorganization estate, the [IRS'] tax lien is not dissolved; nor is its status as a secured creditor destroyed. The IRS, under § 363(e), remains entitled to adequate protection for its interests, to other rights

on May 23, 1996. This is only 9 business days after the IRS had an opportunity to act on the Notice of the Debtor's Petition.

Although the Cincinnati Office and the Merrillville Office of the IRS are technically both part of the same U.S.A. Agency, there is no evidence in the record that the Cincinnati Office had knowledge of the Notice of Levy by the Merrillville Office, or that the Merrillville Office knew the Debtor had filed its Petition before the Bank issued its check dated May 23, 1996. Under the circumstances, this is not a basis for the imposition of sanctions versus the IRS for any alleged stay violation.

enjoyed by secured creditors, and to the specific privileges accorded tax collectors. Section 542(a) simply requires the [IRS] to seek protection of its interests according to the congressionally established bankruptcy procedures, rather than by withholding the seized property from the debtor's efforts to reorganize.

*Whiting Pools,* 462 U.S. at 203–04, 211–12, 103 S.Ct. at 2313, 2317.

As Collier on Bankruptcy properly concludes:

The Supreme Court's holding in *Whiting Pools* confirms that a creditor in possession of collateral that the trustee may use, sell, or lease under section 363 must turn over the collateral to the trustee after commencement of the case, but may demand adequate protection as a condition precedent to turnover. This is consistent with the requirement of section 363(e) that *at any time* on request of a creditor, the court shall prohibit or condition the use, sale, or lease of property as is necessary to adequately protect the creditor's interest in the property.

Collier on Bankruptcy, ¶ 542.01, pp. 542–11–12 (15th ed. Rev.1997). (emphasis in original).

■ The Court has previously concluded that the proceeds of the Bank account in the sum of $1,928.00, are property of the Estate pursuant to § 541(a). The IRS has filed a secured proof of claim versus the Debtor's estate in the sum of $1,311,145.23 to which the Trustee has no objection. Because this is a Chapter 7, and not a Chapter 11 reorganization, and the Trustee is not operating the Debtor's business pursuant to § 721, it would appear at first blush, that the Trustee's § 542(a) Turnover Complaint should be denied, as § 542(a) requires that the IRS only turn over property of the estate if it is not of inconsequential value and not burdensome to the estate. The tax lien of the IRS far exceeds the amount of the proceeds of the Bank account. However, § 724(b) can create value for an estate in property that is over encumbered and that absent § 724(b) would be abandoned. So long as the amount of the avoided tax lien exceeds administrative costs, the property has value to the estate. *In re*

*K.C. Mach. & Tool Co.,* 816 F.2d 238, 247 (6th Cir.1987).

Although § 724(b) provides for the subordination of the IRS' tax lien to claim allowed under § 507(a)(1)–(a)(7), the fact remains that the tax lien retains its status as a secured claim. Section 724(b) merely alters the scheme of distribution. *In re Darnell,* 834 F.2d 1263, 1268 n. 10 (6th Cir.1987). It remains to be seen after all estate assets are liquidated and the claim process has been completed as to whether § 724(b) shall be applicable in this case. *See In re K.C. Mach. & Tool Co.,* 816 F.2d at 245. (§ 724(b) merely mandates a particular method of distribution of what property is left in debtor's estate at the time of distribution).

The Trustee is thus correct that pursuant to § 724(b), the IRS' tax lien in the proceeds of the Bank account could be subordinated and made available to him to pay claims arising under §§ 507(a)(1)–(a)(7). Thus, the Debtor's estate may have a legitimate interest in the proceeds of the Bank account if it eventually turns out after all assets are administered, and all allowed claims are determined, that there are not sufficient estate funds on hand to pay all §§ 507(a)(1)–(a)(7) claims versus the Debtor's estate without utilizing the proceeds of the Bank account.

■ However, the cases are legion, that because § 542(a) expressly refers to § 363, before a secured creditor is required to turnover property of the Debtor's estate, the Trustee must first provide the IRS with adequate protection as to lien interest. *See* cases cited by the IRS set out in pp. 553–54 of this Memorandum Opinion. *See also, In re Young,* 193 B.R. at 626, *supra* (collecting cases). This he did not do. Thus, the Trustee has no right to the turnover of the funds in question until the IRS is adequately protected as to its lien rights by the Trustee.

This leaves the Court with the perplexing problem of whether it can enter a dispositive final order in this Adversary Proceeding based upon the U.S.A.'s Motion for Summary Judgment, and yet preserve the Trustee's potential right in the future to utilize the proceeds of the Debtor's Bank account pursuant to § 724(b), if necessary, after all es-

tate assets have been fully administered and liquidated, and all duly filed claims have been finally allowed or disallowed.

The Court concludes that it shall enter an interlocutory Order pursuant to Fed.R.Civ.P. 56(d), which provides that if a summary judgment is not rendered on the whole case for the relief asked, and a trial is necessary, the Court shall, if practical, ascertain what material facts exist without substantial controversy, and what material facts are actual and in good faith controverted, and thereupon make an order specifying what facts appear without substantial controversy.

It is therefore,

**ORDERED** that the proceeds of the Calumet National Bank Account in the sum of $1,903.01 is property of the Debtor's Estate pursuant to § 541(a). And it is further,

**ORDERED,** that said proceeds are subject to a prepetition lien by virtue of the Notice of Levy by the IRS dated April 30, 1996. And it is further,

**ORDERED,** that by virtue of the Notice of Levy issued by the IRS to the Bank on April 30, 1996, the IRS had prepetition constructive possession of the funds in the Debtor's Bank account. And it is further,

**ORDERED,** that the IRS did not violate the § 362(a) automatic stay by failing or refusing to affirmatively act and advise the Calumet National Bank postpetition to not comply with the prepetition Notice of Levy. And it is further

**ORDERED,** that the IRS did not violate the § 362(a) automatic stay by failing and refusing to comply with the Trustee's demand letter pursuant to § 542(a) that it turn over the proceeds of the Bank account, in that it could require adequate protection from the Trustee for its lien in the Bank proceeds as a condition precedent to turning over the proceeds to the Trustee, and that the Trustee did not offer or provide the U.S.A. with any adequate protection for its lien interest therein as required by § 363(e). And it is further,

**ORDERED,** that the IRS may at this time retain the proceeds of the Bank account; provided, however, that in the event that after all estate assets are fully administered and liquidated, and all duly filed claims are allowed or disallowed, and the Trustee determines that the proceeds of the Bank account are reasonably necessary to pay §§ 507(a)(1)—(a)(7) claims versus the Debtor's estate, and that the lien of the IRS should be subordinated pursuant to § 724(b), he may file his Supplemental Complaint in this Adversary Proceeding, so alleging, and if after a trial on the merits, the Court determines that the Bank proceeds are in fact required to pay any such claims, the Court may enter a Final Judgment in favor of the Trustee pursuant to § 542(a), without the necessity of the Trustee first providing adequate protection to the U.S.A. as to its lien.